GUIDRY, J.
IpThe State of Louisiana, through the Department of Transportation and Development (the DOTD), appeals a judgment rendered pursuant to a jury verdict finding it liable for a car accident allegedly caused by a malfunctioning traffic signal at an intersection.
FACTS AND PROCEDURAL HISTORY
On Christmas Eve 2006, Angela Cotton and her stepson, Blaine Cotton, were traveling south on Highway 661 in Houma, Louisiana to attend midnight mass. On reaching the intersection of Highway 661 and Highway 24, Mrs. Cotton stopped for the red light. According to Mrs. Cotton and her stepson, when the light on the traffic signal turned green, she proceeded to enter the intersection, where her vehicle was struck by a vehicle driven by Kerry A. Carter, who was traveling east on Highway 24. Mr. Carter reported that the traffic signal governing his path of travel also displayed a green light at the time he drove into the intersection and collided with Mrs. Cotton’s vehicle.
On April 5, 2007, Blaine, Mrs. Cotton, and her husband, Andy Cotton, jointly filed a petition for damages against the DOTD,[1] and the case was tried before a jury that found the DOTD to be 100 percent at fault for causing the December 24, 2006 accident. The jury awarded Mrs. Cotton $851,973.00 and Blaine $8,204.98 in general and special damages. The jury further awarded Mr. Cotton $20,000 for past and future loss of consortium. The trial court signed a judgment in conformity with the jury’s verdict on January 20, 2010, which the DOTD suspensively appeals.
J^ISSUES PRESENTED FOR REVIEW
The DOTD suspensively appealed the January 20, 2010 judgment, alleging the following:
1. The jury erred in finding that there was a defect in the traffic signal at the intersection of Highway 661 and Highway 24 that caused the traffic signal to display green lights to both Mrs. Cotton and Mr. Carter simultaneously.
*217 2. The jury erred in finding that the DOTD had actual or constructive notice of the alleged defect in the traffic signal prior to the accident.
3. The jury erred in finding that Mrs. Cotton’s neck and right shoulder injuries, and related medical treatment, were proximately caused by the December 24, 2006 accident.
4. The jury erred in awarding Mrs. Cotton damages based on a finding that she is partially disabled.
5. The jury erred in awarding Mrs. Cotton past and future loss of wages and loss of earning capacity.
DISCUSSION

ISSUES ONE AND TWO:

Generally, in order to recover damages against the DOTD, a public entity, a plaintiff must prove: (1) the DOTD had custody of the thing that caused plaintiffs damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time; and (4) the defect was a cause-in-fact of plaintiffs injuries. See La. R.S. 9:2800; La. C.C. arts. 2317 and 2317.1; Netecke v. State, DOTD, 98-1182, p. 7 (La.10/19/99) 747 So.2d 489, 494. The trier of fact’s findings regarding defect and notice under La. R.S. 9:2800 are subject to the manifest error standard of review. See Ricks v. City of Shreveport, 42,675, p. 8 (La.App.2d Cir.10/24/07), 968 So.2d 863, 868.
The DOTD does not dispute that it had custody of the traffic signal at issue; however, it greatly disputes the assertion that the traffic signal was defective or that it had actual or constructive notice of any allegedly defective condition in the |4traffic signal. Our review of the record reveals that there was sufficient evidence presented to support the jury’s findings on these issues.
The DOTD argues that none of the witnesses who testified that the traffic signal displayed green for opposing lanes of travel actually saw the simultaneous display of green. However, the police officers who investigated the December 24, 2006 accident verified the claims of the accident victims that the traffic signal was displaying conflicting green lights. At trial, the investigating police officers, Jarrod Math-erne and Joseph Renfro, testified that they sat in their individual police cars at right angles to the intersection to observe the traffic signal from southbound Highway 661 and eastbound Highway 24, respectively. While so positioned, the officers testified that they both reported the traffic signal to display green at the same time for their observed direction about every fourth light phase. They testified that they observed the traffic signal display simultaneous green lights at least four times on the night of the accident, which testimony supported the claims of Mrs. Cotton, Blaine, and Mr. Carter that the signal was displaying green for their respective directions of travel at the time the accident occurred.
The plaintiffs also presented the testimony of an expert witness in the field of traffic signal engineering, Dr. Peter Par-sonson,[2] who posited two reasons why the signal was defective and malfunctioned on the date of the accident. First, Dr. Par-sonson explained that, according to industry and manufacturer standards, the con *218 flict monitor controlling a traffic signal should be removed and fully tested (bench tested) to ensure that it is operating properly. Dr. Parsonson described a typical traffic signal as being in a solid state assembly (meaning that it has no moving parts) with semi-conductor components inside that “are supposed to conduct electricity at certain times, [and not] conduct electricity at other times.” |sHowever, he explained “a semi-conductor can fail by shorting through, which means that it is going to conduct, when it [is] not supposed to be conducting electricity.”
Dr. Parsonson testified that since 1968, every single traffic signal installed at an intersection is required to have a conflict monitor installed in a cabinet positioned on the street corner. According to Dr. Par-sonson, the purpose of the conflict monitor is to monitor the voltages that are sent out from the cabinet over field wires to overhead signals. The conflict monitor contains a program card that identifies which signals are compatible, such as displaying a green light for eastbound traffic would be compatible with displaying a green light for westbound traffic. In further explaining how a conflict monitor functions, Dr. Parsonson stated:
[I]t sits there and it watches the voltages that go out over the field wires to the signal heads; and if it sees one hundred twenty (120) volts going out, to two (2) greens that are in conflict with one another, it allows that conflict to take place for as long as one-half (1/2) second. In other words, the conflicting greens will in fact be shown; but for no more than one-half (1/2) second. And we know that drivers cannot react within a half second, and so it is safe. But, the monitor is giving the equipment a half second to recover and to work correctly. But, if that conflict is still being shown to the drivers at that one-half (1/2) second, the conflict monitor forces the intersection to go to flashing operations.
In his expert opinion, and according to articles and books he had reviewed, Dr. Parsonson stated that at a minimum, the conflict monitor should have been bench tested once a year; however, according to the DOTD, the conflict monitor had never been bench tested. Dr. Parsonson stated that in Gwinnett County, Georgia, where he lived, it is discovered that occasionally a conflict monitor fails on testing, although the traffic signal appeared to be cycling normally out in the field. Dr. Parsonson therefore stated, “what this teaches us is that we cannot assume that if the monitor fails, we can count on it to throw the intersection on flash. That’s just not true at all.” Dr. Parsonson also criticized the actions of the|fitraffic signal technicians for those occasions when they would simply turn off the power to the equipment and then turn the power back on to correct the traffic signal. He said such actions are “not fixing anything.” He explained that “what it may be doing with solid state equipment is to allow a failing component to cool off enough to start working properly again, for a while.”
The second reason Dr. Parsonson gave for finding the traffic signal to be defective relates to the construction of the traffic signal. He stated that because of the construction of the signal, rain falling at the time of the accident likely entered the traffic signal and caused it to display conflicting green lights. According to his testimony:
If, in fact, there were conflicting greens as five (5) witnesses are saying, there were, then more likely than not — very probably, certainly with a great degree of engineering probability and certainty, I can say that the conflicting green situation was caused by rainwater entering the wiring at some point.... [T]he *219 rainwater entered the wiring and because water conducts electricity, the water causes a short-circuit from an energized signal wire, one that had one hundred twenty (120) volts in it. A short-circuit over to a wire that provides the green signal, but was not supposed to be receiving one hundred twenty (120) volts at this time. And so, the rainwater was creating a short-circuit that turned on an undesired and inappropriate green signal, that created this crash; caused the crash.
Now, what happens is that ... short is hot. And if you have ever felt a short-circuit go across your fingers, you know it is pretty hot. And what it does is, it causes the water to evaporate. And so, that short dries out, and there is no longer a short. In other words, the continuity in the water is broken. The short is stopped. And the conflicting greens stop. And so, for a period of time, there is no conflict. But then, during that period of time, new rainwater can come into that area, and when enough of it builds up, then the short occurs again; and we have that green coming on [inappropriately], for a certain period of time. And this is exactly what the police officers testified to — in other words[,] they testified that they witnessed conflicting greens in about one (1) cycle out of every four (4). And so, this intermittent conflict is easy to explain. If it occurred during rain, and we know from the police report that it was raining at the time. So, this intermittent conflict is easy to explain on the basis of water entering the wiring system and creating a short. And then the short dries up from the heat that is generated by it. And you go through a period with no conflicting greens. But then new rainwater comes in and creates the cycle all over again. And so, for as long as it rains, we have this cycle of conflict — no conflict — conflict—no conflict.
17Pr. Parsonson then went on to explain that he believed that rainwater entered the traffic signal via the quick disconnect hanger used to attach the signal to the span of field wire from which the traffic signal is suspended. He stated that use of quick disconnect hangers is a good practice in Louisiana because of the occurrence of hurricanes. Nevertheless, he opined that the DOTD could have easily discovered and fixed the problem of water entering the signal via the quick disconnect hanger.
In addition to the testimony of the plaintiffs expert, the DOTD’s expert in traffic engineering, traffic control, accident reconstruction, and highway design, construction and maintenance, Mr. Vernon Odean Tekell, admitted that water could enter the wiring system and cause a short as Dr. Parsonson described. However, Mr. Te-kell opined that the short would cause the red and yellow lights to shine faintly at the same time as the green shone brightly, rather than causing conflicting green lights to display, “unless the wire was [insulated], and it was rubbed off of the green wire, on the adjacent head, and such that when the water intrusion caused the small voltage to come through, that is the only way you can get (quote) ‘these lights to go out at the same time’.”
In considering expert testimony, the trier of fact may accept or reject in whole or in part the opinion expressed by an expert. The effect and weight to be given expert testimony is within the broad discretion of the trier of fact. The trier of fact may accept or reject any expert’s view, even to the point of substituting its own common sense and judgment for that of an expert witness where, in the trier of fact’s opinion, such substitution appears warranted by the evidence as a whole. *220 Morgan v. State Farm Fire and Casualty Company, Inc., 07-0334, pp. 8-9 (La.App. 1st Cir.11/2/07), 978 So.2d 941, 946. The law is well settled that where the testimony of expert witnesses differs, the trier of fact has great, even vast, |8discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. Harper v. Falrig Offshore, Inc., 03-28, p. 3 (La.App. 3d Cir.4/30/03), 845 So.2d 589, 591, writ denied, 03-1905 (La.10/31/03), 857 So.2d 483.
Considering the foregoing testimony, the jury could have found the evidence was sufficient to prove that the traffic signal at issue was defective. Both experts testified that the display of conflicting green lights could occur, and the fact witnesses presented by the plaintiffs all testified that such a happening did in fact occur. Therefore, we find the jury was not clearly wrong in finding the traffic signal to be defective.
Still, the DOTD contends that even accepting the finding that the traffic signal was defective, the plaintiffs failed to establish that it had actual or constructive notice that a defect existed in the traffic signal that would allow it to display conflicting green lights. All of the local witnesses that were familiar with the intersection, including the plaintiffs and the investigating police officers, testified that prior to the accident, they had never observed the traffic signal display conflicting green lights, nor could anyone state that such a phenomenon had been observed since the accident. Nevertheless, the plaintiffs presented evidence that the DOTD did not perform any specifically-scheduled or regular preventive maintenance of the traffic signal, nor did it keep sufficiently detailed repair records regarding the traffic signal to verify that such an occurrence had not previously occurred.
Travis P. Cortez, whose responsibilities included supervising crews in charge of signal light, sign, and facility maintenance for the DOTD, testified that the traffic signal crew in charge of maintenance for the parishes of Terrebonne and Lafourche was made up of only two people. Consequently, he testified that he was unable to provide a schedule for the performance of regular preventative | maintenance of the traffic signals in the area, but he could only direct the crew to work on specific problems as they arose.
As previously stated, Dr. Parsonson testified that industry and manufacturer standards for conflict monitors recommend that the monitors be removed and tested on at least an annual basis. The DOTD admits that such testing was never performed on the conflict monitor that controlled the traffic signal at issue. Thus, Dr. Parsonson opined that the DOTD’s failure to test the conflict monitor resulted in the agency not discovering that the conflict monitor was defective.
Dr. Parsonson also testified that whenever the conflict monitor sets the traffic signal at an intersection to flashing, the reason why the traffic signal was set to flash is displayed on the conflict monitor’s LCD screen. He observed that for multiple work orders that he reviewed, the traffic signal technicians failed to document why the traffic signal was set to flash. As a result, it is unknown whether the reason the traffic signal went to flash on those prior occasions was because of a simple power surge or because the signal was displaying conflicting green lights. He further observed that the conflict monitor was never removed for bench testing, despite the frequent number of times the work orders showed that the traffic signal was displaying flashing lights. Dr. Par-sonson opined that the DOTD improperly relied on the conflict monitor to set the *221 traffic signal to flashing and such reliance is misguided, because the monitor could fail. The plaintiffs’ position is that the conflict monitor failed at the time of the accident rather than going into flash, and in the exercise of reasonable care, if the DOTD had tested the conflict monitor, it would have revealed the monitor was defective and deteriorating to the point that it could no longer perfectly function.
Mr. Cortez admitted that the multiple work orders showing that the signal had been set to flash did make him think that “maybe something was going on with this light at this intersection.” As he stated, “in this case, I am sure I told [the 11fltraffic signal crew] we need to check it out. We probably have a short somewhere, that it kicked into flash; and this ... specific incident, I am sure it was when it rained, we had water causing the problem.”
Based on this evidence, the jury could have reasonably concluded that the numerous work orders completed for the traffic signal at issue provided the DOTD with notice that the traffic signal was defective and that something more than simple repair was necessary to prevent further malfunctioning of the traffic signal at issue. See Barthel v. State, Department of Transportation and Development, 04-1619, pp. 5-7 (La.App. 1st Cir.6/10/05), 917 So.2d 15, 19-20; see also Warden v. Richoux, 09-794, pp. 7-10 (La.App. 5th Cir.3/23/10), 40 So.3d 139, 145-47, writ denied, 10-0921 (La.6/25/10), 38 So.3d 340. Further, the jury could have found that the exercise of reasonable care required the removal and testing of the conflict monitor to reveal the defect. As such, we cannot say the jury was manifestly erroneous in determining that the DOTD had notice of the defect. Accordingly, we reject the argument presented in DOTD’s second issue for review.

ISSUES THREE AND FOUR

Prior to the December 24, 2006 accident, a colectomy surgery was performed on Mrs. Cotton in September 2006 to remove an extensive portion of her colon. As a result of the surgery, Mrs. Cotton developed a condition called “scapular winging,”[3] for which she was being treated at the time of the December 24, 2006 accident. Although many of Mrs. Cotton’s complaints of pain in her right arm, shoulder, and neck following the December 24, 2006 accident appear to be identical to her complaints of pain in her right arm, shoulder, and neck prior to the Inaccident, which her healthcare providers related to the scapular winging, the record discloses that there was objective medical evidence presented to show that the December 24, 2006 accident caused additional injury to Mrs. Cotton.
Dr. Brett Casey, Mrs. Cotton’s treating orthopedist, first examined her relative to the accident on March 26, 2008, although he had previously examined her regarding her scapular winging on December 7, 2006, prior to the auto accident. According to the medical history Dr. Casey recorded, Mrs. Cotton reported that after the accident, she had some weakness and pain in her right shoulder that was in a different location than she had before with the scapular winging. On examination, Dr. Casey observed that she had pain in her a/c joint, which is the joint where the *222 clavicle or collar bone meets the shoulder. He further noted that Mrs. Cotton had pain moving her arm and some signs of impingement, which is injury to the rota-tor cuff. Based on her presentation, Dr. Casey performed shoulder arthroscopy with an arthroscopic rotator cuff repair, a distal clavicle resection, and a sub-chromium decompression, which treated the impingement. Dr. Casey opined that based on Mrs. Cotton’s history, he related the rotator cuff repair surgery to the December 24, 2006 accident, as he found that she did not have any rotator cuff symptoms when he examined her prior to the accident on December 7, 2006.
Likewise, Dr. Phillip McAllister, the neurosurgeon who operated on Mrs. Cotton’s neck following the December 24, 2006 accident, testified that diagnostic tests of Mrs. Cotton’s cervical spine showed visible changes in Mrs. Cotton’s condition following the accident. The first time Dr. McAl-lister saw Mrs. Cotton was in January 2007. In treating Mrs. Cotton, Dr. McAl-lister reviewed an EMG scan that had been performed in November 2006, and compared that scan to the scan he had ordered in January 2007. In comparing the scans, it was observed that the post-accident scan showed a right C-6 radiculo-pathy that had developed since [ 12the November 2006 scan. Dr. McAllister explained that radiculopathy means that there has been some trauma or pathology of the nerve root in the spine. Thus, the term radiculopathy “not only tells [us] that there has been a change for the worse in the nerve root, but that it also localizes it to the spinal level.”
Dr. McAllister also had a myelogram performed to show Mrs. Cotton’s nerve roots, and that test revealed that there was bi-lateral spondylolysis at C-6, without evidence of spondylolisthesis. As Dr. McAllister explained:
What that means is that spondylolis-thesis is that the bones have shifted in alignment. But what had occurred through hyperflexion and hyperextension, and acceleration and deceleration force to the neck is the ligaments of the neck and the muscles are incredibly strong. So, there has been a fracture that occurred. There has been a fracture which occurred bi-laterally at C-6, right here, which showed that the excessive force of the ligaments had been so great that they had caused a fracture in the neck. Fortunately, the disc and the ligaments surrounding the disc had held so fortunately, there was not spinal cord injury, as you would see in the more severe injuries. However, the CAT Scan showed from bony detail that there had been enough force transmitted through the muscles and ligaments of the back, or posterior aspect of the cervical spine, and indeed fracture bone.
Based on what he observed, Dr. McAllister performed an anterior cervical discectomy and fusion surgery on Mrs. Cotton.
Accordingly, the foregoing evidence supports the jury’s finding that the injuries to Mrs. Cotton’s neck and right shoulder, and related medical treatment, were proximately related to the December 24, 2006 automobile accident.
Encompassed within the damages awarded to Mrs. Cotton is the sum of $13,500.00 allocated specifically for Mrs. Cotton’s past and future disability. The DOTD asserts that the jury erred in awarding Mrs. Cotton damages for past and future disability. For purposes of a general tort claim, disability damages are recognized as those general damages constituting any permanent disability or impairment that is secondary to the injuries sustained in the accident. Brossett v. Howard, 08-535, p. 19 (La.App. 3d Cir.12/10/08), 998 So.2d 916, 931, writ de *223 nied, 09-0077 (La.3/6/09), 3 So.3d 492; see also Matos v. Clarendon National Insurance Company, 00-2814, p. 11 (La. App. 1 Cir. 2/15/02), 808 So.2d 841, 848-49.
As a result of the anterior cervical dis-cectomy and fusion surgery, Dr. McAllis-ter stated that the restrictions Mrs. Cotton would have would primarily be from residual pain from any ligament, tendon, or muscle injury; however, he noted the fusion could cause some limitation in range of motion and some increased arthritic changes at the cervical levels above and below the area fused.
Physical therapist Donald Paul Kinnard performed a functional capacity evaluation (FCE) on Mrs. Cotton in June 2008, which indicated that the range of motion for Mrs. Cotton’s right shoulder on flexion and abduction was 170 out of a possible 180, external rotation was 80 out of a possible 90, and internal rotation was 75 out of a possible 90. The strength level of Mrs. Cotton’s right shoulder showed a flexion and abduction of 4 out of a possible 5, external and internal rotation of a 4 out of possible 5, while elbow flexion and extension was a perfect 5 out of a possible 5. Based on the FCE, Mr. Kinnard determined that Mrs. Cotton is capable of performing work duties of a light physical demand level, requiring lifting of no more than 15 pounds on a frequent basis.
At trial, Andy Cotton testified that his wife was just 75% back to normal. He stated that the limitation on her sweeping, mopping, and dusting lasted for about a year to a year and a half and that there was a decrease in marital intimacy for four to five months after the accident because of Mrs. Cotton’s neck injury.
Mrs. Cotton testified that it took nine months before she could completely lift her hand overhead following the shoulder surgery. As of the date of trial, she testified that her neck was “pretty good,” although she felt it “every now and then”; however, for her shoulder, she stated that she has “a lot of weakness in [her] hands; shoulders, just muscle strength.” She admitted that she is still able to engage in Ii4many of the activities she did before the accident, but she just is unable to engage in such activities for as long as she could before.
Nevertheless, according to Dr. Casey’s medical records, by October 2008, he found that there was full range of motion in Mrs. Cotton’s shoulder and her strength was good, although she still suffered with some aching pain. In a medical note dated three months later in January 2009, Dr. Casey reported “Ms. Cotton returns for continued evaluation of her right shoulder. That is doing fine. She has great range of motion and good strength without pain.”
Considering this evidence, we find merit in the DOTD’s assertion that the jury erred in awarding Mrs. Cotton damages for past and future disability. While the evidence presented demonstrated that there have been some slight changes in Mrs. Cotton’s physical endurance and lifestyle, those changes are not of the scale that the changes could be deemed disabling. Moreover, none of Mrs. Cotton’s healthcare providers assessed her with any rating of disability. Cf. Brossett, 08-535 at 20, 998 So.2d at 931; Matos, 00-2814 at 11, 808 So.2d at 849; Rizzuto v. Walker, 00-876, p. 4 (La.App. 5th Cir.9/26/00), 779 So.2d 759, 760-61. Thus, we hold that the jury erred in finding that the plaintiffs met their burden of proving that Mrs. Cotton is entitled to an award for past and future disability.

ISSUE FIVE

In the fifth issue presented for review, the DOTD contends that the jury erred in awarding Mrs. Cotton future loss of earnings and earning capacity. Accord *224 ing to the verdict form, the jury awarded Mrs. Cotton a lump sum for past and future loss of earnings and earning capacity in the amount of $33,770.00. The DOTD and the plaintiffs presented the testimony of competing economic experts regarding Mrs. Cotton’s wage losses. The plaintiffs’ expert, Dr. Randolph Rice, testified that Mrs. Cotton’s past loss of earnings from January 1, 2007, through the date of trial, based on $10 an hour and a forty-hour work week, would equal 11fi$63,027.00. Dr. Rice then projected that Mrs. Cotton’s future wage loss could equal as little as $192,028.00, based on her work life expectancy, and as much as $326,606.00, based on Mrs. Cotton working to a retirement age of 66 years and ten months.
The DOTD’s expert, Dr. Kenneth Bou-dreaux, calculated Mrs. Cotton’s past lost wages by averaging her yearly income for 2004, 2005, and 2006, and then alternatively using just the years 2004 and 2005, as the two years she had earned her highest income. Using the three-year average, Dr. Boudreaux determined that Mrs. Cotton’s past wage loss from January 1, 2007, through the date of trial was $21,820.00. Using the two-year figure for the same time period, Dr. Boudreaux calculated that Mrs. Cotton’s past wage loss was $27,996.00. Because the FCE performed by Mr. Kinnard showed that Mrs. Cotton was capable of resuming employment earning income at the same rate she had prior to the accident, Dr. Boudreaux did not project any future loss of income for Mrs. Cotton.
Based on the figures presented by the economic experts, it appears that the jury did not award. Mrs. Cotton any damages for future loss of earnings or earning capacity. The wage loss amount awarded is much less than any amount projected by Dr. Rice. Moreover, although the amount awarded is greater that the highest sum calculated by Dr. Boudreaux as Mrs. Cotton’s past lost wages, the sum is less than the figure offered by Dr. Rice. Thus, we find that the amount awarded should be properly considered as an award of past loss of earnings only.
A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Boyette v. United, Services Automobile Association, 00-1918, p. 3 (La.4/3/01), 783 So.2d 1276, 1279. The trier of fact has broad discretion in assessing awards for lost wages, but there must be a factual basis in the record for the award. Driscoll v. Stucker, 04-0589, p. 29 (La.1/19/05), 893 So.2d 32, 53. Where there is no basis 116for a precise mathematical calculation of a past lost wage claim, the trier of fact can award a reasonable amount of damages without abusing his discretion. Burrell v. Williams, 05-1625, p. 10 (La.App. 1st Cir.6/9/06), 938 So.2d 694, 701.
Apparently the jury found merit in both experts’ testimony, as the amounts awarded Mrs. Cotton for past loss of earnings appear to be a compromise of the two figures presented by the competing experts. Where, as here, a conflict in the evidence exists and neither party presents evidence that is wholly inconsistent, implausible on its face, or unbelievable in light of objective evidence, the appellate court must defer to the factfinder’s decision unless that decision is manifestly erroneous or clearly wrong. Henderson v. Nissan Motor Corporation U.S.A 03-606, p. 14 (La.2/6/04), 869 So.2d 62, 71. Having reviewed the evidence presented, we cannot say that the amount awarded Mrs. Cotton for past lost earnings was an abuse of the jury’s discretion. Accordingly, we reject this final argument by the DOTD in the issues presented for review.
*225 CONCLUSION
For the foregoing reasons, we amend the January 20, 2010 judgment to delete the award for past and future disability. In all other respects, the judgment is affirmed. All costs of this appeal, in the amount of $7,421.50, are assessed to the State of Louisiana, through the Department of Transportation and Development.
AMENDED, AND AS AMENDED, AFFIRMED.
PARRO, J., concurs.

. The plaintiffs also named their UM insurer, Government Employees Insurance Company (GEICO), Mr. Carter, and Mr. Carter’s liability insurer, State Farm Mutual. Automobile Insurance Company, as additional defendants in the petition. GEICO filed a cross claim against the other named defendants, seeking to recover amounts it expended on property damage and rental reimbursement for its insured, as well as to recover the deductible and rental expenses incurred by its insured. The plaintiffs later settled with GEICO and dismissed their claims against it prior to trial. The plaintiffs also dismissed their claims against Mr. Carter and State Farm with full prejudice.

. Although the trial transcript shows Dr. Par-sonson’s name spelled as "Parsonsons,” other documents that appear in the record, including Dr. Parsonson's curriculum vitae, indicate that the correct spelling of his name is without and “s” at the end.

. Scapular winging is described as a condition where the hack muscle is weakened so that the scapula, or the hack part of the shoulder, pulls off the back so that it looks like there is a wing on the back. It usually comes from a muscle that has been paralyzed, but over time the muscle re-awakens and the condition repairs itself. According to Dr. Brett Casey, an orthopedist, Mrs. Cotton likely developed the condition as the result of being positioned on the operating table during her colectomy surgery in such a way that it placed pressure on a nerve that is in the axial under the arm.