SUSAN M. CHEHARDY, Judge.
|aIn this case, both parties are appealing the lower court judgment. Noble Drilling US, Inc., defendant/first appellant, challenges the jury’s verdict in favor of plaintiff. Stephen and Corinna Willis, plaintiffs/second appellants, challenge the trier-of-fact’s apportionment of fault and the quantum of general damages. For the following reasons, we reverse in part, amend, affirm in part, and render the judgment.

Facts and Procedural History

In January of 2007, plaintiff, Stephen Willis, was assigned by his employer, Fug-ro Chance, to work as a survey party chief[1] aboard the NOBLE LESTER PET-TUS, a submersible drilling rig owned by Noble Drilling, US, Inc. (hereinafter “Noble”). On or about January 12, 2007, while the rig was en route from Pascagoula, Mississippi to its destination, a storm arose so the crew began to submerge the rig to ride out the storm.
As the crew submerged or “ballasted down” the rig, an unknown volume of elemental mercury was expelled through a small opening in the top of a large 13ballast control valve in the control room of the NOBLE LESTER PETTUS (hereinafter “LESTER PETTUS”). Several employees, including Mr. Willis and John Delaney, another Fugro Chance employee, were working in the control room at that time. Mr. Willis stated that mercury “rained” down on his arms, hands, and head, as well as the work surfaces. Mr. Willis also testified that he inhaled mercury and accidentally drank mercury that dropped into his coffee cup. Mr. Willis was unable to locate a Material Safety Data Sheet (“MSDS”) pertaining to mercury on board the LESTER PETTUS.
After about two hours, the rig was submerged and fully ballasted so Mr. Willis contacted his supervisor via satellite telephone to report the incident. His supervisor, Ken Daigle, instructed Willis on cleanup and first aid procedures.[2]
Pursuant to his employer’s instructions, Willis isolated the contaminated navigation equipment and set up a second set of navigation equipment. Mr. Willis also isolated the contaminated clothing. Mr. Willis did not, however, isolate his contaminated shoes, satellite telephone, or briefcase.
The next day, when Mr. Willis returned to the control room, he observed mercury on the second set of equipment. He reported the second release and waited while his company sent a third set of navigation equipment to the rig. Although he was not present in the control room for the second mercury release, he was exposed when he entered the area and contacted the second set of contaminated navigation equipment. The Daily Surveyors Report log for the control room for the following day reads, “It is indicated that [starboard] ballast indicator is still blowing mercury out of the relief valve.”
Four days later, Mr. Willis disembarked the LESTER PETTUS in Louisiana wearing his boots and carrying his briefcase. Two weeks later, Mr. Willis ^experienced *835 continuous “rapid twitching” of his eyes, “enormous headaches,” and tremors and numbness in his hands. The next time that Mr. Willis was back onshore, he sought medical treatment from his family physician who referred him to an epileptol-ogist.
Mr. Willis sued numerous defendants, including the vessel owner, Noble. After a five-day trial, the jury found that Noble’s negligence caused Mr. Willis’s injury and awarded Mr. Willis $600,000.00 for past and future lost wages. Both parties are appealing that judgment.

NOBLE’S APPEAL

On appeal, Noble raises eight assignments of error: first, the trial judge erred in finding that OSHA standards applied to Noble; second, the trial judge erred in finding that OSHA standards applied to the vessel M/V NOBLE LESTER PET-TUS; third, the trial judge erred in finding that OSHA standards created a duty on the vessel owner to provide a MSDS to a non-employee; fourth, the trial court erred in finding that a violation of OSHA standards constitutes negligence; fifth, the trial court erred in enforcing a stipulation that was a mistake of fact; sixth, the trial court erred in allowing Corinna Willis to claim loss of society in a maritime action; seventh, the jury erred in awarding the plaintiff lost wages when it found that he had not suffered any general damages; and, eighth, the trial court erred in awarding costs when a timely motion for new trial on costs had not been filed.
In its fifth assignment of error,[3] Noble argues that the trial court abused its discretion by refusing to allow Noble to withdraw its stipulation as to the location of the rig at the time of the mercury release. Noble avers that the stipulation that the incident occurred in State of Louisiana waters, to which it inadvertently agreed in the pre-trial order, is a mistake of fact. Plaintiffs argue that there is no specific | r,evidence that the stipulation in question is a mistake of fact. Furthermore, plaintiffs argue that, even if the stipulation is a mistake of fact, plaintiff continued to be exposed to mercury through Noble’s failure to adequately address the spill until he disembarked the LESTER PETTUS in Louisiana waters.
First, we cannot say that this issue was properly preserved for review. Our review of the record reveals the following statement from counsel for Noble during a bench conference after the jury was sworn and opening statements were delivered:
Before we read number three, I need to reurge my objection to the evidence. Stipulation No. 3 as[sie] part of an inadvertent error on our part. It’s not an accurate depiction of the facts, and therefore we’re asking the Court to recall that stipulation while the evidence is coming to show where [the] incident actually did occur.
Immediately thereafter, the trial judge allowed the stipulations to be read into evidence, including the statement that this release occurred in the waters of the State of Louisiana.
For an issue to be preserved for review, a party must make a timely objection and state the specific ground for the objection.[4] Failure to contemporaneously object constitutes a waiver of the right to *836 complain on appeal.[5] Furthermore, the reasons for the objection must be brought to the attention of the trial court to allow it the opportunity to make the proper ruling and prevent or cure any error.[6]
Even if the objection made during the bench conference was sufficient to preserve the issue for review, we would find no error in the trial judge’s refusal to allow Noble to withdraw a stipulation after trial had commenced.[7]
|(jA stipulation has the effect of a judicial admission or confession, which binds all parties and the court. Stipulations between the parties in a specific case are binding on the trial court when not in derogation of law, and are the law of the case.[8] Accordingly, the joint trial stipulation entered into by the parties in the present case had the effect of a judicial confession binding both the parties and the court.
By entering into the joint stipulation that the incident occurred in the waters of the State of Louisiana, the parties judicially admitted to the law that applied to this incident. The correctness of a judicial admission cannot later be denied when the party, which the admission benefitted, relied upon it to his or her detriment.[9]
Here, plaintiffs relied on the stipulation that the situs of the rig was not an issue at trial, and, thus, were not required to prove the rig’s location. Having entered into the stipulation in the pre-trial order well in advance of trial, Noble cannot claim that the trial court erred in preserving the joint trial stipulation.[10] We find no error in the trial court’s ruling on this issue.
We return now to Noble’s first assignment of error. In it, Noble argues that OSHA regulations do not apply to this case because OSHA governs only employer-employee conduct. First, we note that the Occupational Health and Safety Act is remedial legislation designed to protect employees from workplace dangers, and therefore must be liberally construed.[11]
29 U.S.C. § 654(a) delineates the duties of employers under OSHA:
(a) Each employer—
(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards [ 7that are causing or are likely to cause death or serious physical harm to his employees;
(2) shall comply with occupational safety and health standards promulgated under this chapter.
*837 Importantly, 29 U.S.C. § 654(a)(1) & (2) impose two distinct duties. First, (a)(1) requires employers to protect their own employees from hazards in the workplace. The employer’s duty under (a)(1) flows only to its employees, as indicated by the language specifically limiting the employer’s obligation to maintain a hazard-free workplace to “his employees.”
Second, (a)(2) requires employers to comply with the entire Act’s safety standards. Unlike (a)(1), it does not limit its compliance directive to the employer’s own employees, but requires employers to implement the Act’s safety standards for the benefit of all employees in a given workplace, even employees of another employer. OSHA citations based on the multi-employer doctrine are issued under 29 U.S.C. § 654(a)(2). Thus, we conclude that, although Mr. Willis is not an employee of Noble, in this particular instance, he is among the class of individuals protected by OSHA. This assignment of error lacks merit.
In its second assignment of error, Noble argues that OSHA regulations do not apply to the M/V LESTER PETTUS because the regulations do not govern Coast Guard “inspected” vessels located on the Outer Continental Shelf. We disagree.
First, it is important to note that Mr. Willis does not qualify as a “seaman” under OSHA because he lacks a connection to a vessel or vessels that is substantial in terms of time and nature.[12] See also, Willis v. Fugro Chance, 278 Fed.Appx. 443 (5th Cir.2008) (Mr. Willis was not a Jones Act seaman).
IsNext, § L of OSHA Directive CPL 2-1.20, which was in effect that the time of this incident, provided that, although the U.S. Coast Guard exercises full authority over the safety and health of seamen aboard “inspected”[13] vessels, OSHA may exercise its authority over employers, other than those that only employ seamen, for the working conditions on vessel within OSHA’s geographical jurisdiction. (Emphasis added). “OSHA requirements which remain enforceable on inspected vessels for employees other than seamen are ... long shoring operations, ... marine construction activities, ... general working conditions not otherwise regulated, [and] ... Identified recognized hazardous situations that are causing or are likely to cause death or serious physical harm.” OSHA Directive CPL 02-1.20 § L(2). Thus, Mr. Willis’ status as a non-seaman allows OSHA regulations to apply to the general working conditions while he is on-board an inspected vessel.
Furthermore, OSHA’s geographical jurisdiction applies to oil and gas rigs in State territorial seas. Specifically, § I of OSHA Directive CPL 2-1.20 provided that the OSH Act applied “to employment performed in a State of the United States.” For “coastal states, the State territorial waters extend 3 nautical miles seaward from the coast line” so OSHA has authority over vessels when they are operating within the limits of State territorial waters.
Finally, and, arguably most importantly, Captain Mark Fazioli, an expert in marine *838 operations and safety of the crew and vessel, testified that OSHA regulations apply whenever a vessel carrying non-seamen is in state waters. Noble did not present testimony to refute this statement. Thus, the unrefuted evidence at trial established that OSHA applied in this instance.
|nIn its third assignment of error, Noble argues that OSHA regulations regarding “hazard communication” are inapplicable on their face because Noble is not Mr. Willis’s employer and Noble is not a producer or importer of chemicals. Further, Noble argues that the multi-employer doctrine applied solely to construction workers. Again, we disagree.
29 C.F.R. § 1910.1200(e)(2), entitled “Written hazard communication program,” provides, in pertinent part, for multi-em-ployer workplaces:
Employers who ... use ... hazardous chemicals at a workplace in such a way that the employees of other employer(s) may be exposed ... shall additionally ensure that the hazard communication programs developed and implemented under this paragraph (e) include the following:
(i) The methods the employer will use to provide the other employer(s) on-site access to safety data sheets for each hazardous chemical the other employer(s)’ employees may be exposed to while working;
(ii) The methods the employer will use to inform the other employer(s) of any precautionary measures that need to be taken to protect employees ... in foreseeable emergencies; and,
(iii) The methods the employer will use to inform the other employer(s) of the labeling system used in the workplace.
[[Image here]]
(4) The employer shall make the written hazard communication program available, upon request, to employees, their designated representatives, the Assistant Secretary and the Director, in accordance with the requirements of 29 CFR 1910.1020(e).
(5) Where employees must travel between workplaces during a workshift, i.e., their work is carried out at more than one geographical location, the written hazard communication program may be kept at the primary workplace facility-
Thus, OSHA does require an employer, in a multi-employer workplace, to provide the other employers on-site access to safety data sheets for each |inhazardous chemical the other employers’ employees may be exposed to while working. This argument lacks merit.
In its fourth assignment of error, Noble argues that the trial court erred as a matter of law in charging the jury that the violation of OSHA standards is negligence per se.[14] At trial, the trial judge charged the jury, inter alia: “Violating OSHA standards constitutes negligence.” Noble’s assertion that the jury was charged that an OSHA violation equates to negligence as a matter of law is an overstatement.
La. C.C.P. art. 1792(B) requires the trial court to instruct jurors on the law applicable to the case submitted to them. It is the judge’s responsibility to require that the jury receives only the correct law.[15]
*839 Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case.[16] Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice.[17]
Because the adequacy of jury instruction must be determined in the light of jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial.[18] Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts.[19]
[nThus, on appellate review of a jury trial, the mere discovery of an error in the judge’s instructions does not, in and of itself, justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case.[20] “As long as the combined charges accurately cover the point of law at issue, no reversible error exists.”[21]
The pertinent question involved in deciding whether reversible error has occurred is whether the jury was misled to such an extent as to prevent it from doing justice.[22] In the instant case, the jury was given combined charges that accurately cover the law of negligence. We cannot say that the slight error in this case misled the jury to such as extent as to prevent the jury from ensuring justice. This assignment of error lacks merit.
In its sixth assignment of error, Noble argues that the trial court erred in allowing Corinna Willis to claim loss of society in a maritime action. We disagree. In Miles v. Apex Marine Corp., 498 U.S. 19, 31, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990), the United State Supreme Court held that, where a longshoreman is killed or injured in state territorial waters, loss of consortium is still available.[23] See also, Nichols v. Petroleum Helicopters, Inc., 17 F.3d 119, 123 (5th Cir.1994). Accordingly, it was not error for the trial judge to charge the jury regarding Mrs. Willis’ loss of society claim.
In its seventh assignment of error, Noble argues that the jury erred in awarding the plaintiff lost wages when it found that *840 he had not suffered any general damages. We agree.
|, 2In general, it is legal error for a jury to award special damages for medical expenses while at the same time denying general damages.[24] When, as here, the jury has awarded special damages but has declined to award general damages, the reviewing court must determine whether the jury’s finding “is so inconsistent as to constitute an abuse of discretion.”[25] If so, only then can the reviewing court perform a de novo review of the record.[26] Plaintiffs have raised this issue as well so we will discuss the failure to award general damages when we address plaintiffs’ assignments of error.
In its eighth and final assignment of error, Noble argues that the trial court erred in awarding costs when a timely motion for new trial on costs had not been filed. We disagree.
La. C.C.P. art. 1920 specifically reads that, “Unless the judgment provides otherwise, costs ... may be taxed by a rule to show cause.” In this case, the Judgment submitted by Noble did not address costs. As such, the statute authorizes taxing costs by a rule to show cause. This assignment lacks merit. For the foregoing reasons, we find no merit in Noble’s assignments of error and affirm the challenged rulings and findings.

PLAINTIFFS’ APPEAL

On appeal, plaintiffs raise four assignments of error: first, the district court erred in including King Gauge on the Jury Verdict form and the jury erred in attributing fault to King Gauge because Noble Drilling failed to present any evidence of King Gauge’s fault during trial; second, the jury’s award of past and future lost wages was abusively low; and, finally, in their last two assignments, | ^plaintiffs challenge, as reversible error, the jury’s failure to award general damages to Stephen Willis and loss of consortium damages to Corinna Willis.
In their first assignment of error, plaintiffs contend that the trial court erred in denying their motion for judgment notwithstanding the verdict because Noble failed to demonstrate fault on the part of King Gauge, which precluded the inclusion of King Gauge on the verdict form. Further, plaintiffs contend that the jury’s apportionment of 50% fault to King Gauge was erroneous.
La. C.C.P. art. 1811 provides the procedural guidelines for obtaining a JNOV. In Lawson v. Mitsubishi Motor Sales of America, Inc., 05-0257 (La.9/6/06), 938 So.2d 35, 52,[27] our supreme court reiterated the standard to be used in determining whether a JNOV should be granted or denied:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strong *841 ly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
A refusal to render a JNOV can only be overturned if it is manifestly erroneous.[28]
Plaintiffs argue that JNOV was warranted in this case because the trial court erred in including jury interrogatories that asked the jury to assess fault to a party whose liability is not supported by the evidence. The record reveals that the plaintiffs timely objected to including King Gauge on the jury interrogatory form because Noble had not presented any evidence of King Gauge’s liability as the manufacturer of the ballast control valve. The trial court noted the plaintiffs’ | uobjection, but did not alter the verdict form in any way. After deliberating, the jury ultimately assessed 50% fault to King Gauge, 25% to Noble, and 25% to Stephen Willis.
Our review of a jury’s answers to its interrogatories is governed by the manifest error standard of review.[29] In determining the adequacy of jury interrogatories, the pertinent law governing the specific type of case at hand should be reviewed.[30] Thus, in the instant case, we turn to the law regarding comparative fault to determine if the jury interrogatories were so misleading or confusing as to constitute reversible error.
In Louisiana, delictual actions are governed by La. C.C. art. 2815, which states that “[e]very act of man that causes damage to another obliges him by whose fault it happened to repair it.” Thus, under La. C.C. art. 2315, a tortfeasor must compensate a tort victim for all of the damages occasioned by his act. La. C.C. art. 2323 provides, in pertinent part, as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
When a defendant urges the fault of a non-party, it is incumbent upon that defendant to provide a preponderance of evidence that fault actually exists on the *842 part of the non-party.[31] Where non-parties are claimed by a defendant to be at fault |! 5in causing damages to the plaintiff, the burden shifts to the defendants to show not only the fault of the non-parties, but the percentage thereof.[32] Therefore, despite the mandate of comparative fault, a defendant is not relieved of the burden of proving that the non-party’s conduct was a causative factor of the damages sustained and was a breach of duty to the plaintiff.[33]
In this case, in responding to plaintiffs’ petition for damages, Noble alleged that plaintiff and numerous other defendants’ negligence or fault contributed to plaintiffs’ damages. However, Noble did not introduce evidence at trial to bear the requisite burden of proof regarding any allocation of fault to the manufacturer of the ballast control gauge, King Gauge.[34] Although Captain Mark Fazioli described the chemical release as a “malfunction” and “equipment failure,” that is not evidence of a manufacturing or design defect sufficient to rise to the level required under products liability law.[35] In short, the record before us does not support the jury’s finding that King Gauge was at fault in causing Mr. Willis’ injuries in this case.
Thus, by including King Gauge on the special verdict form, the trial court created confusion and misled the jury into returning a verdict that was clearly contrary to the evidence and applicable law.[36] We find that it was reversible error for the trial court to include King Gauge on the jury interrogatories.
Because we have found that the trier-of-fact’s apportionment of fault in this case was clearly wrong, we will adjust the award to that extent that was reasonably l^within the trial court’s discretion; we give some deference to the trial court’s allocation of fault.[37]
In determining apportionment of fault, the court should consider the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. The factors to be considered include (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, *843 whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.[38]
In this case, the jury determined that Mr. Willis was 25% at fault, the vessel owner, Noble, was 25% at fault, and the gauge manufacturer, King Gauge, was 50% at fault. Having already found that the jury erred in allocating fault to King Gauge, we will apply the Watson factors to the other two assessments made by the jury.
With respect to the vessel owner, the evidence at trial revealed that Noble was not aware of any problem with the ballast control gauge before the first release on January 12, 2007. However, there was a Noble employee in the control room when the chemical release occurred so, at that moment, Noble became aware of the incident. The evidence at trial reflected that Noble attempted to decontaminate the control room after the first release.
However, the evidence further revealed that, after the second release, mercury was not immediately removed from the work surfaces or the environment of the control room, which suggest that Noble was not as diligent with decontaminating the control room after the second release. Clearly, Noble was in 117the best position to control the clean-up of the control room as the owner of the rig and employer of most of the personnel onboard the vessel. Further, the testimony at trial revealed that, in this situation, the vessel owner is responsible for the clean-up.
In applying the factors also to Mr. Willis, we note that he had no control over or awareness of the gauges that “spewed” mercury. He did, however, have control over his contact with his personal belongings, including his boots, his satellite phone, and his briefcase, which were exposed to mercury. Against instructions, he kept those contaminated objects, which subjected him to continued exposure even after disembarking the • LESTER PET-TUS. For that reason, we will not adjust the jury’s finding that Mr. Willis was 25% at fault for his injury.
For these reasons, we find that the highest percentage of fault that should have been attributed to Noble was 75% and to Mr. Willis was 25%. Thus, the judgment in this case is amended to reflect these percentages.
In their remaining assignments of error, plaintiffs challenge the quantum of the jury’s award of general and special damages.
In Louisiana, as noted above, del-ictual actions are governed by La. C.C. art. 2315, which states that “[e]very act of man that causes damage to another obliges him by whose fault it happened to repair it.” Thus, under La. C.C. art. 2315, a tortfea-sor must compensate a tort victim for all of the damages occasioned by his act. The term “damages” refers to “pecuniary compensation, recompense, or satisfaction for an injury sustained.”[39]
In the delictual context, La. C.C. art. 2315 authorizes compensatory damages.[40] Compensatory damages encompass those damages “designed to place 11sthe plaintiff in the position in which he would have been if the tort had not been *844 committed.”[41]
Compensatory damages are further divided into the broad categories of special damages and general damages.[42] Special damages are those which have a “ready market value,” such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages, while general damages are inherently speculative and cannot be calculated with mathematical certainty.[43]
The Louisiana Supreme Court has defined general damages as “those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money.”[44] Much discretion is accorded the trier of fact in its assessment of quantum — both special and general damages.[45]

Special Damages

First, plaintiffs challenge the past and future' lost wages awarded by the jury. Plaintiffs specifically contend that the evidence presented at trial showed that Mr. Willis had suffered past lost wages of $345,220.00.
A plaintiff seeking damages for past lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. The trier of fact has broad discretion in assessing awards for lost wages, but there | l9must be a factual basis in the record for the award.[46] Where there is no basis for a precise mathematical calculation of a past lost wage claim, the trier of fact can award a reasonable amount of damages without abusing his discretion.[47]
At the time of the accident on January 12, 2007, Mr. Willis was a Survey Party Chief for Fugro Chance. His Income Tax Return for 2006 reflected his adjusted gross income as $82,776.00. The jury, in awarding Mr. Willis $200,000.00 in past lost wages, apparently determined that he was entitled to almost 3 years of lost compensation. Further, the jury awarded Mr. Willis $400,000.00 in future lost wages. Given the discretion afforded the jury in its evaluation of the credibility of the witnesses, we find no abuse of discretion in the jury’s award of $200,000.00 in past lost wages and $400,000.00 in future lost wages.

General Damages

Plaintiffs next challenge that jury’s failure to award general damages even though the jury awarded $600,000.00 in special damages.
*845 “General damages” involve mental or physical pain and suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money.[48] Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury.[49] The factors to be considered in assessing quantum of, damages for pain and suffering are severity and duration.[50]
l2nFor purposes of a general tort claim, disability damages are recognized as those general damages constituting any permanent disability or impairment that is secondary to the injuries sustained in the accident.[51] Disability is defined as “the inability to perform some function,” or alternatively, “[a]n objectively measurable condition of impairment, physical or mental.”[52] Impairment is simply defined as “[t]he fact or state of being damaged, weakened or diminished.”[53]
Similarly, loss of enjoyment of life refers to the detrimental alterations of a person’s life or lifestyle or a person’s inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury.[54] Whether a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.[55] Accordingly, whether damages for loss of enjoyment of life are recoverable is a question that depends on the particular facts of the case and is to be left to the discretion of the trier of fact, to be determined on a case-by-case basis.[56]
The general rule is that a jury commits legal error in awarding special damages for medical expenses while at the same time denying general damages.[57] Upon review, we must determine whether the jury’s failure to award general damages is so inconsistent with its award of $600,000.00 in special damages that the deficiency constitutes an abuse of discretion by the trier of fact.[58]
Clearly, Mr. Willis’s mental condition and pain and suffering after his exposure is undisputed. The jury’s substantial special damage award for past and future lost wages is inconsistent with the finding that Willis did not suffer any compensable pain and suffering associated with this accident. The jury did abuse |g1its discretion in failing to award general damages and the trial court erred in refusing to grant Mr. Willis’s JNOV.
Because we have found an abuse of discretion, we conduct a de novo review of the record and render an award appropriate to the particular facts and circumstances pre *846 sented in the record.[59] In making the initial award of damages at the appellate level, this Court is not limited to an award of either the lowest or highest amount that we would affirm; rather we set the award in an amount which is just compensation for the damages revealed by the record.[60]
In addition to the medical evidence presented by Willis evidencing his dementia following the accident, the following testimony was presented regarding the drastic change in Willis’s personality and lifestyle following the accident.
Willis, who was 50 years old at the time of trial, testified that, as he was in good health and had been working for Fugro Chance for 10 years prior to the chemical exposure. He stated that he worked one additional tour immediately after the chemical exposure in question but, within four months, he was fired. He reported that he was fired because he could not perform his job duties at the same level that he had before his exposure.
Mr. Willis described having a “twitching thing going on” with his hands and eyes, coldness and numbness in his extremities, headaches, and confusion. He continues to have significant trouble with confusion and memory loss. He has problems recognizing familiar faces and remembering recent conversations. He no longer drives himself places because he gets lost easily.
Prior to the accident, Willis worked consistently and enjoyed listening to police scanners and repairing radios. Now, he mainly watches television and birds.
12?He stated that his relationship with his wife has deteriorated because of his injury on many levels, including sexually. Because he has been unable to work since the accident, his family’s sole source of income is his monthly disability check from the Social Security Administration. His drastically different financial situation causes significant stress to him.
Based on the testimony and evidence, we believe an award of $400,000.00 for general damages is appropriate in this case. We amend the judgment of the trial court to award general damages accordingly.
Finally, plaintiffs challenge the jury’s failure to award damages for loss of consortium to Corinna Willis. “Loss of consortium” includes such elements such as loss of service, loss of love and affection, loss of society and companionship, loss of sexual relations, loss of support, and loss of felicity or overall contentment and happiness.[61]
In this case, the jury found that Mrs. Corinna Willis was not entitled to a loss of consortium award. Based on our review of the evidence in this case, we do not find the trial court erred in refusing to award Mrs. Willis for loss of consortium.[62] This assignment of error lacks merit.

Conclusion

The judgment of the trial court is reversed in part and affirmed in part as amended. We reverse the jury’s finding assessing 50% fault to non-party, King Gauge, and find that defendant, Noble, bears 75% of the fault. We affirm the jury’s finding that Stephen Willis bears 25% of the fault.
*847 Next, it is ordered, adjudged, and decreed that there be judgment in favor of the plaintiff, Stephen Willis, in the sum of $400,000 in general damages. In all 1 pother respects, the trial court judgment is affirmed. Costs of this appeal are assessed entirely against defendant, Noble Drilling.

REVERSED IN PART; AFFIRMED IN PART, AS AMENDED; AND RENDERED

WICKER, J., dissents with reasons.

. A survey party chief helps to navigate a submersible rig to its drilling location and to confirm its position.

. Noble employees removed the spilled mercury from the control room work surfaces by "scraping the liquid mercury from the desk surfaces with index cards." Captain Mark Fazioli stated that this was not the proper procedure for clean-up of a mercury spill of that magnitude.

. Although it is not our usual practice, in this case, we will, to promote clarity, address Noble’s assigned errors in an order different than the order in which they were presented.

. La. C.E. art. 103 A(l); La. C.C.P. art. 1635.

. Nunnery v. City of Kenner, 08-1298 (La.App. 5 Cir. 5/12/09), 17 So.3d 411, 415.

. See Jeansonne v. Bosworth, 601 So.2d 739 (La.App. 1st Cir. 1992), writ not considered, 614 So.2d 75 (La.1993).

. On the third day of trial, in an attempt to "correct” the mistake, counsel for Noble attempted to introduce evidence of the rig's location at the time of the chemical release. The plaintiffs objected and the trial judge refused to allow introduction of this evidence, which would nullify the stipulation.

. La. C.C. art. 1853; R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984); Comberrel v. Basford, 550 So.2d 1356 (La.App. 5 Cir.1989), writ denied, 556 So.2d 1284, 1285, 1286 (La.1990).

. Crawford v. Deshotels, 359 So.2d 118 (La.1978); Dolsen v. City of New Orleans, 559 So.2d 50 (La.App. 4 Cir.1990).

. Cain v. Aquarius Builders, Inc., 96-66 (La.App. 5 Cir. 7/30/96), 680 So.2d 69, 74-75.

. Whirlpool Corp. v. Marshall, 445 U.S. 1, 11, 13, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980); Clarkson Constr. Co. v. Occupational Safety & Health Review Comm'n, 531 F.2d 451, 458 (10th Cir.1976).

. OSHA defines "seaman” in § A, paragraph 12 of CPL 2-1.20, issued November 8, 1996, as: "an individual engaged or employed in any capacity on board a vessel, and who has a more or less permanent connection with a vessel, and who contributes to the function of the vessel or to the accomplishment of its mission. [46 USC Section 10101(3)].”

. "Inspected” vessels are those vessels required by law to be inspected and certified by the U.S. Coast Guard. It was stipulated at trial that the LESTER PETTUS was an “inspected” vessel.

. "Per se" is defined in Black's Law Dictionary (9th ed.2009) as "1. Of, in, or by itself; standing alone, without reference to additional facts, or 2. As a matter of law.”

. Melancon v. Sunshine Construction, Inc., 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016.

. See Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d 466 (La.App. 1 Cir. 3/11/94), writ denied, 638 So.2d 1094 (La.6/17/94).

. Nicholas v. Allstate Insurance Company, 99-2522 (La.8/31/00), 765 So.2d 1017, 1023; Jones v. Liberty Mutual Ins. Co., 568 So.2d 1091, 1094 (La.App. 5 Cir. 1990), writ denied, 572 So.2d 72 (1991) (reversible error occurs when the jury is misled to such an extent as to prevent it from doing justice).

. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 804-06.

. Id.

. Id.; Jones, 568 So.2d at 1094.

. United States v. L’Hoste, 609 F.2d 796, 805 (5 Cir.1980) (quoting United States v. Blevins, 555 F.2d 1236, 1239 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)).

. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.1983), writ denied, 434 So.2d 1097 (La.1983).

. See, Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), superseded on other grounds as noted in, Miles v. Apex Marine Corp., 498 U.S. 19, 20, 111 S.Ct. 317, 319, 112 L.Ed.2d 275 (1990).

.Wainwright v. Fontenot, 00-492 (La. 10/17/00), 774 So.2d 70. However, "a jury ... can reasonably reach the conclusion that a plaintiff has proven his entitlement to recovery of certain medical costs, yet failed to prove that he endured compensable pain and suffering as the result of defendant’s fault.” Id. at 76. See also, Sallinger v. Robichaux, 00-2269 (La. 1/5/01), 775 So.2d 437.

. Id. at 76.

. Id.

. Lawson, supra (quoting Davis v. Wal-Mart Stores, Inc., 00-0445 (La. 11/28/00), 774 So.2d 84, 89).

.Delaney v. Whitney National Bank, 96-2144 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 717, writ denied, 98-0123 (La.3/20/98), 715 So.2d 1211.

.Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089, p. 5 (La.App. 1 Cir. 6/23/95), 657 So.2d 1066, 1069, writ denied, 95-1883 (La. 11/17/95), 663 So.2d 720.

.Id.

. Terro v. Casualty Reciprocal Exchange, 93-593 (La.2/2/94), 631 So.2d 651, writ denied, 94-0522 (La.4/22/94), 637 So.2d 157; Woodbury v. Louisiana Dept. of Transp. & Dev., 03-13 (La.App. 5 Cir. 5/28/03), 848 So.2d 104, 112-13, writ denied, 03-1830 (La. 10/31/03), 857 So.2d 477 and writ denied, 03-1832 (La. 10/31/03), 857 So.2d 478.

. Haney v. Francewar, 588 So.2d 1172, 1178 (La.App. 1 Cir. 1991).

. See also, Devereux v. Allstate Insurance Company, 557 So.2d 1091, 1095-96 (La.App. 2 Cir.1990).

. The Louisiana Products Liability Act ("LPLA”) establishes the exclusive theories of liability for manufacturers for damage caused by their products in La. R.S. 9:2800.54. Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831, 848, writ denied, 97-2921 (La.2/6/98), 709 So.2d 735 and writ denied, 97-3000 La. 2/6/98, 709 So.2d 744.

. The Louisiana Products Liability Act (LPLA), La. R.S. 9:2800.51, et seq., provides the exclusive remedy for persons claiming injury due to product defects. Scott v. Am. Tobacco Co., Inc., 04-2095 (La.App. 4 Cir. 2/7/07), 949 So.2d 1266, 1273 writ denied, 07-662 (La. 1/7/08), 973 So.2d 740 and writ denied, 07-654 (La. 1/7/08), 973 So.2d 740.

. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.1983), writ denied, 434 So.2d 1097 (La.1983).

. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609-610.

. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).

. Fogle v. Feazel, 201 La. 899, 909, 10 So.2d 695, 698 (1942).

. McGee v. A C And S, Inc., 05-1036 (La.7/10/06), 933 So.2d 770, 773-74.

. Id. (quoting Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7-1 (Michie 1996)).

. Id.

. Id. (quoting Maraist & Galligan, LOUISIANA TORT LAW § 7-2).

. Duncan v. Kansas City S. R.R., 00-0066 (La. 10/30/00), 773 So.2d 670, 682; Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506, 507 (La.1978); Anderson v. Welding Testing Lab., Inc., 304 So.2d 351, 352 (La.1974).

. La. C.C. art. 2324.1; Menard v. Lafayette Ins. Co., 09-1869 (La.3/16/10); 31 So.3d 996, 1006-1007.

. Cotton v. State Farm Mutual Automobile Insurance Company, 10-1609 (La.App. 1 Cir. 5/6/11), 65 So.3d 213, 220, writ denied, 11-1084 (La.9/2/11), 68 So.3d 522.

. Id. at 224.

. McGee, supra at 774.

. Id. at 775.

. Jenkins v. State, DOTD, 06-1804, p. 26 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, 767, writ denied, 08-2471 (La. 12/19/08), 996 So.2d 1133.

. Matos v. Clarendon National Ins. Co., 00-2814 (La.App. 1 Cir. 2/15/02), 808 So.2d 841, 848-49.

. Bryan A. Garner, Black’s Law Dictionary (9th ed.2009).

. Id.

. McGee, supra at 773.

. Id. at 775.

. Id. at 774-775.

. Wainwright v. Fontenot, 00-492 (La. 10/17/00), 774 So.2d 70.

. Id.

. Wainwright, supra.

. Lyons v. Fleet Operators, Inc., 96-0148 (La.App. 4 Cir. 6/5/96), 676 So.2d 182, 188, writ denied, 96-2142 (La. 11/8/96), 683 So.2d 278.

. Finley v. Bass, 478 So.2d 608 (La.App. 2 Cir. 1985).

. Cf. Tracy v. Jefferson Parish Through Dept. of Pub. Works, 523 So.2d 266, 277 (La.App. 5th Cir.) writ denied, 530 So.2d 569 (La.1988).