11 COOKS, Judge.
STATEMENT OF THE CASE
This is a medical malpractice action. Kerstin Oakley sued Dr. Howard Stelly for damages which resulted from having her ovaries removed without her consent.
Ms. Oakley was first diagnosed with Crohn’s disease, a serious intestinal inflammatory disease, in 1984 which necessitated the removal of her large intestines and half of her small intestines in 1994. On May 3, 1995, she was admitted to W.O. Moss Hospital in Lake Charles, Louisiana *913 for a hysterectomy and take down of her ileostomy, both of which were related to her Crohn’s disease. The hysterectomy was to be performed by Dr. Howard Stelly and the take down of her Reostomy was to be performed by Dr. Michael Freeburger.
Following her admission to the hospital, and after having been sedated and prepared for surgery, Ms. Oakley recalled Dr. Stelly asking her something regarding her ovaries. The consent form which Ms. Oakley signed on April 27, 1995 was for an abdominal hysterectomy and authorized Dr. Stelly to “remove my uterus.” It is undisputed the consent form did not address the removal of her ovaries. After the operation, she began experiencing hot flashes and was informed by the nurse she needed a hormone patch. When she questioned the nurse about her ovaries, the nurse told her their removal was necessary due to their diseased condition.
Ms. Oakley remained hospitalized for the remainder of May 1995 to undergo three additional surgeries related to her Crohn’s disease. She was discharged on June 1, 1995. For the next several months, Dr. Stelly continued to provide follow-up care to Ms. Oakley in connection with her Crohn’s disease, later recommending that she undergo yet another surgery to remove her rectum. Ms. Oakley returned to her native Germany in December 1995 for a second opinion. Following a surgical procedure in Germany, her rectum was preserved. Subsequent to surgery, her German physician ^questioned Ms. Oakley about the removal of her ovaries and whether any diagnostic tests were performed to justify their removal. When she informed her physician that no diagnostic tests were performed as a predicate to the removal of her ovaries, the physician informed her it was likely that nothing was wrong with them. It was at this point, in December 1995, that Ms. Oakley began to question the possible misrepresentation of the physical condition of her ovaries by the nurse at W.O. Moss Hospital in May 1995 and the possible malpractice of Dr. Stelly.
A request was made for a medical review panel on December 23, 1996. The medical review panel found Dr. Howard Stelly deviated from the appropriate standard of care and stated:
The evidence supports the conclusion that this defendant failed to comply with the appropriate standard of care as charged in the complaint ... The conduct complained of ... was a factor in the resulting damages.
The record does not specifically reflect that Dr. Stelly spoke with the patient at a time when she was not sedated and explained to her the usual implications of the removal of her ovaries. This would have met the standard of care on informed consent.
The record does not reflect intra operative pathology of the ovaries and the operative report does not reflect it, which might have prompted Dr. Stelly to remove the ovaries as an intra operative decision, and would have obviated the need for informed consent.
In the absence of the consent form of any mention to the patient of the normal implications of removal of the ovaries, the panel must conclude that Dr. Stelly’s removal of the patient’s ovaries fell below the standard of care as to informed consent.
Ms. Oakley filed a malpractice action against Dr. Howard Stelly. Dr. Stelly filed an Exception of Prescription and Ms. Oakley filed a Motion for Partial Summary Judgment on the issue of liability. The trial court denied Dr. Stelly’s Exception of Prescription and granted Ms. Oakley’s Partial Summary Judgment on the issue of liability. Dr. Stelly did not appeal the *914 judgment on liability. The case was tried on the issue of | odamages and the trial court awarded Ms. Oakley $175,000.00 in general damages and $22,588.80 for past, present and future medical expenses. Dr. Stelly appeals the damage award and asserts the trial court erred in denying the Exception of Prescription. For the reasons assigned below, we affirm the decision of the trial court.
ASSIGNMENT OF ERROR NUMBER ONE: PRESCRIPTION
Dr. Stelly contends Ms. Oakley had sufficient information to excite her curiosity about her medical condition in the hospital on May 4, 1995, following her hysterectomy surgery. He argues since Ms. Oakley’s claim is based on lack of consent, she was aware after surgery her ovaries had been removed without her consent; and she was, therefore, placed on notice of the facts giving rise to the malpractice claim in May 1995. Since she did not file for a medical review panel until December 23, 1996, nineteen months later, Dr. Stelly asserts her claim has prescribed.
The prescriptive period for medical malpractice actions is governed by La.R.S. 9:5628 which provides in relevant part:
A. No action for damages for injury or death against any physician, chiropractor, dentist, psychologist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
(Emphasis added.)
The statute by its terms provides two prescriptive limitations within which to bring a medical malpractice action; one year from the date of the alleged act or one year from the date of discovery of the alleged act of malpractice. Campo v. Correa, 2001-2707 (La.6/21/02); 828 So.2d 502.
pMs. Oakley contends prescription did not begin to run until December 23, 1996, when a German physician informed her of the likelihood that her ovaries were unaffected by the Crohn’s disease and removal of them was unnecessary. Since the information she received from the German physician contradicted information Ms. Oakley received from the nurse, it was at this point that she began to consider the possibility that Dr. Stelly was negligent in removing her ovaries. An action was instituted within one year from that date.
In Campo v. Correa, 2001-2707 (La.6/21/02); 828 So.2d 502, Dr. Correa performed lumbar surgery on Mr. Campo on April 10, 1991. Within weeks after the surgery, Mr. Campo began experiencing spinal fluid leakage which necessitated an additional surgery to insert a lumbar peritoneal shunt. Dr. Correa continued to treat Mr. Campo for several months. Mr. Campo left Dr. Correa’s care and returned to Dr. Olson, his previous physician. Dr. Olson treated Mr. Campo for pain in the lumbar area and eventually referred him to Dr. Billings, a neurosurgeon. On October 26, 1993, over two years from the date of the lumbar surgery, Dr. Billings examined Mr. Campo and told him Dr. Correa’s use of the lumbar peritoneal shunt was improper. Five months later, on March 1, 1994, Mr. Cam-po filed a medical malpractice complaint with the Patient’s Compensation Fund *915 against Dr. Correa. Dr. Correa filed an exception of prescription contending Mr. Campo was alerted to facts which would have placed a reasonable person on notice that an alleged act of malpractice had occurred. Dr. Correa pointed to the fact that Mr. Campo knew of the spinal leakage immediately following surgery and subsequently developed complications from the shunt surgery, including spinal meningitis. Dr. Correa asserted these facts gave Mr. Campo constructive knowledge in May 1991. The Louisiana Supreme Court disagreed and concluded the spinal fluid leak was “insufficient to arouse Campo’s suspicion that Dr. Correa had committed medical malpractice.” The court articulated 15the rule regarding prescription in a medical malpractice case:
Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Percy v. State, E.A. Conway Memorial Hosp., 478 So.2d 570 (La.App. 2 Cir.1985). A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. Ledet v. Miller, 459 So.2d 202 (La.App. 3 Cir.1984), writ denied, 463 So.2d 603 (La.1985); Bayonne v. Hartford Insurance Co., 353 So.2d 1051 (La.App. 2 Cir.1977); Opelousas General Hospital v. Guillory, 429 So.2d 550 (La.App. 3 Cir.1983). Nevertheless, a plaintiffs mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Gunter v. Plauche, 439 So.2d 437, 439 (La.1983). Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. Griffin v. Kinberger, 507 So.2d 821 (La.1987). The ultimate issue is reasonableness of the patient’s action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant’s conduct. See Griffin, 507 So.2d at 821.
Campo v. Correa, 2001-2007, p. 6 (La.6/21/02); 828 So.2d 502.
In Griffin v. Kinberger, 507 So.2d 821 (La.1987), Sharon Anselmo gave birth to a premature baby boy on November 14, 1964. From November to December 1964, the child was placed in an incubator and was administered large amounts of oxygen. Mrs. Anselmo noticed the baby was having eye trouble sometime in 1965 and she brought the problem to the attention of the baby’s pediatrician, Dr. Kinberger, and to the attention of an ophthalmologist. Both doctors consistently reassured Mrs. Anselmo that the eye condition was a natural and expected consequence of the necessary administration of oxygen to premature babies. Mrs. Anselmo testified she had no reason to believe otherwise until October 21, 1982, when she read a newspaper article concerning a malpractice award in Florida involving the negligent I (¡administration of oxygen following a premature birth. She took her child to another doctor who diagnosed retrolental *916 fibroplasia, a condition linked to excessive oxygen use at birth. On August 17, 1983, Mrs. Anselmo filed a malpractice action against Dr. Kinberger. The Louisiana Supreme Court held Mrs. Anselmo, prior to the time she read about the condition in the newspaper, had no reason to relate the child’s eye symptoms to any malpractice on the part of the physicians, especially since the physicians told her the symptoms were the normal result of the necessary administration of oxygen. The court held the doctrine of contra non valentem suspended the running of prescription during the time the cause of action was not known or reasonable known to Mrs. Anselmo. The court held “[c]onstruetive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong.” Griffin v. Kinberger, 507 So.2d at 823. The court found the first point in time when Mrs. Anselmo could have been reasonably alerted that she may have a cause of action against the physician was when she read the newspaper article. Prior to that time she relied on information told to her by physicians regarding her child’s eye condition. “The doctrine of contra non valen-tem therefore suspended the running of prescription during the time that the cause of action was not known or reasonably knowable to plantiffs.” Griffin v. Kinberger, 507 So.2d at 824.
Dr. Stelly contends Ms. Oakley had actual and constructive notice immediately after surgery that her ovaries were removed. The record does not support a finding that Ms. Oakley knew or could have known that Dr. Stelly removed healthy ovaries when he performed the hysterectomy. The consent form signed by Ms. Oakley contained the following language: “I further authorize the doctors to perform any other procedure that in their judgment is advisable for my well being.” We find, Ms. Oakley reasonably believed that the removal of her ovaries was a necessary and unfortunate 17consequence of her Crohn’s disease. Her assumption was confirmed by the nurse following the surgery. Ms. Oakley had a very serious intestinal inflammatory disease which necessitated drastic surgical procedures, including removal of her large intestines and a portion of her small intestines. The hysterectomy scheduled in May 1995 was related to the spread of her Crohn’s disease and she had every reason to assume the information she received from the nurse was, in all likelihood, correct. She would never have consented to the removal of healthy ovaries.
Ms. Oakley trusted Dr. Stelly and assumed if Dr. Stelly removed her ovaries they must have been diseased. In fact, Dr. Stelly only spoke to Ms. Oakley for a brief time following the May 4, 1995 hysterectomy surgery. For the weeks following the surgery she was preoccupied preparing for three additional surgeries and the possible removal of her rectum. We find Ms. Oakley was reasonable in her belief that there was a link between the removal of her ovaries and her Crohn’s disease and that she was justified in not making further inquiries until she learned from her German physician that the removal of her ovaries was, in all probability, unnecessary. She filed for a medical review panel within one year of receiving this information. We find the malpractice action was timely filed.
ASSIGNMENT OF ERROR NUMBER TWO: DAMAGES

General Damages

Dr. Stelly contends the general damage award of $175,000.00 is excessive and not supported by the evidence. The trial court awarded $100,000.00 for the early onset of *917 menopause, and its attendant consequences, including estrogen therapy for twenty-two years, and $75,000.00 for loss of procreativity. The trial judge rejected damage claims for the breakup of Ms. Oakley’s marriage and for fear of breast cancer due to hormone replacement therapy-
The trial court found the testimony of Drs. Patín and Hayes supported a finding |sthat Ms. Oakley would experience the effects of menopause twenty-two years earlier than normal. The trial court stated:
The other element of damages involves surgical menopause and its consequences, including the estrogen therapy, for 22 years. As for the consequences of surgical menopause itself, the court understands from the testimony that even with the estrogen therapy as a limiting factor, plaintiff can expect to experience from time to time hot flashes, vasomotor difficulties, vaginal dryness and atrophy, as well as some decreased well-being libido. Even though the medical evidence was in controversy as to increased risk of cardiovascular disease and gall bladder disease, there is certainly sufficient evidence from the medical testimony to give a reasonable person substantial anxiety concerning cardiovascular and gall bladder disease.
Most significantly, plaintiff is at an increased risk for osteoporosis ... as a result of which she has been ordered to have an annual bone scan.
We find the award of $100,000.00 for the early onset of menopause supported by the record, and we affirm the trial court’s decision.
With regard to the evidence on the issue of damages for loss of procreativity, the trial court concluded:
The court concludes that plaintiff probably would have had one additional child if able to do so. The court must further consider that surrogate motherhood is problematic at best, and that as Dr. Hayes testified, she is not a good candidate for same. Nevertheless, the surgery did remove any possibility for this. Under these circumstances, the court looks upon this as a loss of a chance for another child. Considering existing awards for loss of a child, the court finds that an award of $75,000.00 for loss of surrogate motherhood or loss of the chance of a child is a fair and just amount in this case.
We agree with the trial judge and affirm the award of $75,000.00 for loss of procrea-tivity.

Annual Bone Scan

The trial court concluded the evidence supported a finding Ms. Oakley will require annual bone scans to monitor her bone loss and the possible onset of osteoporosis caused by the surgical onset of menopause. The evidence indicated the cost of a bone scan was approximately $40.00 per month and would be necessary for 1 asixteen years and the judge awarded an amount of $7680.00. Dr. Stelly does not dispute the amount only the necessity. He asserts the drug Fosomax, if taken for seven years will prevent bone loss and eliminate the need for an annual bone scan. We find this contention without merit. The trial court correctly concluded the testimony supported the finding even with drug therapy, an annual bone scan would be necessary to monitor Ms. Oakley’s condition.
DECREE
Based on the foregoing, we affirm the decision of the trial court and assess all costs of this appeal to Dr. Stelly.
AFFIRMED.