JOHNSON, J.
[ jDefendants/Appellants, Lexington Insurance Company and Michael Graham, M.D., appeal the judgment and award of damages in favor of Plaintiff/Appellee, Re-nea Fanguy, for a medical malpractice action filed in the 24th Judicial District Court, Division “L”. For the following reasons, we affirm the trial court’s finding that Dr. Graham breached the standard of care in failing to obtain Ms. Fanguy’s informed consent before performing surgery and in awarding Ms. Fanguy past medical expenses for both the June 2008 and December 2008 procedures. We amend the trial court’s award of $49,664 for medical expenses to conform to the evidence and award $48,607.69. Further, we amend the trial court’s award of $33,000 for general damages, finding it abusively low and award Ms. Fanguy $50,000 for pain and suffering. Finally, we reverse the trial court’s denial of compensation for loss of enjoyment of life and render an award of $15,000 in that regard. Thus, we reverse in part and affirm the judgment as amended by this Court.
PROCEDURAL HISTORY
This is the second appeal between the parties in this medical malpractice aetion. In the first appeal, this Court reversed the trial court’s judgment that sustained Defendants’ exception of prescription and denying Ms. Fanguy’s motion in limine to exclude the medical review panel’s opinion from evidence. Fanguy v. Lexington Ins. Co., 12-136 (La.App. 5 Cir. 11/13/12), 105 So.3d 848; affirmed in part and reversed in part and remanded, 13-114 (La. 4/1/13); 110 So.3d 127. Following this Court’s previous decision, the Louisiana Supreme Court granted writs of certiorari, affirmed this Court’s decision as to the prescription issue, reversed this Court’s decision to strike the medical review panel opinion, and ^ordered the medical review panel to be reconstituted with different physician-members to deliberate and to issue an opinion on the issues presented in this case.
After the matter was remanded to the trial court by the Louisiana Supreme Court, a second medical review panel was constituted to review whether Dr. Graham committed medical malpractice in his treatment gynecologic medical and surgical of Ms. Fanguy. In the “Findings of the Medical Review Panel,” the medical review panel found that the evidence did not support the conclusion that Dr. Graham failed to meet the applicable standard of care, which was informed consent. At the conclusion of the second medical review panel, Ms. Fanguy pursued her ongoing case in district court.
A trial on the merits of Ms. Fanguy’s petition was held on February 24, 2015. In a judgment rendered on February 26, 2015, the trial court found that Dr. Graham’s treatment fell below the standard of care in failing to obtain informed consent to remove Ms. Fanguy’s right ovary and in removing the right ovary. The trial court awarded Ms. Fanguy a total amount of $82,664, which consisted of $33,000 for past, present and future pain and suffering, and $49,664 for past medical expenses.
Defendants filed a Motion for New Trial on March 9, 2015, asserting the judgment was contrary to the law and evidence submitted in the matter. On March 10, 2015, Ms. Fanguy filed a Motion to Tax Costs, requesting that various costs in the *488 amount of $37,876.08, plus any further post-trial motion costs, be assessed against Defendants. The motions were heard on April 20, 2015. In a judgment rendered on the same date as the hearing, the trial court denied Defendants’ motion and partially granted Ms. Fanguy’s motion by disallowing certain fees and only taxing $32,138.38 in costs against Defendants. Defendants timely filed their Motion for Appeal, and the instant appeal followed.
J^FACTS
Renea Fanguy was a long time patient of Dr. Michael Graham. Prior to 2008, Dr. Graham sporadically treated Ms. Fanguy for left-sided pelvic pain and four pregnancies.[1] On June 6, 2008, Ms. Fanguy saw Dr. Graham after an emergency visit to the hospital for pelvic pain. Dr. Graham performed an examination and recommended a laparoscopy for diagnostic purposes and possible vaporization of adhe-sions. Ms. Fanguy signed a consent form and the surgery was performed on June 17, 2008. Dr. Graham’s operative report diagnosed Ms. Fanguy with endometrios-is[2] and possible adenomyosis.[3] No problems were noted on Ms. Fanguy’s followup visit.
On December 1, 2008, Ms. Fanguy returned to Dr. Graham with complaints of left-sided pelvic pain[4] and dyspareunia.[5] Dr. Graham discussed and recommended laparoscopic supracervical hysterectomy with left salpingo-oophoreetomy (removal of the left ovary and fallopian tube). On December 18, 2008, Ms. Fanguy met Dr. Graham for a preoperative visit, during which they discussed the planned procedure, purpose, risks, benefits, and treatment options. Ms. Fanguy signed a consent form, and the surgery was performed on December 26, 2008. Dr. Graham’s preoperative diagnosis was left-sided pelvic pain, | ¿dyspareunia, and menorrhagia.[6] During the surgery, Dr. Graham saw that the uterus was “pressing on the left-hand side.” After further examination, Dr. Graham determined that the left ovary was normal, whereas the right ovary was totally encapsulated with adhesions and stuck to the uterus. Based on Ms. Fanguy’s request to keep one ovary to prevent early menopause, Dr. Graham removed the right ovary. Ms. Fanguy subsequently returned to Dr. Graham complaining of continued left-sided pain and a new right-sided pain. In October 2009, Ms. Fanguy sought a *489 second opinion with Dr. Susan Jeanfreau for her continued left-sided pain and her new right-sided pain. Dr. Jeanfreau treated Ms. Fanguy, and she is now relatively pain free.
In her medical malpractice complaint against Dr. Graham, Ms. Fanguy contended that Dr. Graham breached the applicable standard of care by failing to obtain her informed consent for the June 2008 and December 2008 surgeries. Ms. Fanguy argued that the two surgeries were unnecessary, ineffective, and for each surgery Dr. Graham failed to discuss therapeutic alternatives, (ie., Lupron), for chronic pelvic pain and endometriosis. Ms. Fanguy also contended that Dr. Graham breached the applicable standard of care by failing to inform her of the risk of removing only one ovary as opposed to both ovaries as it relates to endometriosis. Finally, Ms. Fan-guy claimed that Dr. Graham breached the applicable standard of care when he removed the wrong ovary.
The second medical review panel found that Dr. Graham did not breach any of the standards of care applicable to the claims above. The panel found that the informed consent obtained for the December 2008 surgery was appropriate and it allowed “for the possibility of the removal of either ovary in this procedure.” The panel also found that
|fiIn a young patient desiring to maintain ovarian function, a reasonably prudent physician would remove the diseased ovary and save the healthy ovary. Based on the photograph provided to the panel, despite the lack of pathologic confirmation, it appears that the right ovary had a diseased appearance. This is confirmed by his operative note. It is not uncommon that the surgical findings for later-ality may not match the preoperative imaging or symptomatology in a patient with chronic pelvic pain.[7]
ASSIGNMENTS OF ERROR
On appeal, Defendants allege the trial court erred in; 1) finding there was any breach in the standard of care by Dr. Graham in his care and treatment of Ms. Fanguy; 2) finding a breach of the standard of care by Dr. Graham through specifically determining that Dr, Graham failed to obtain informed consent to remove Ms. Fanguy’s right ovary during the December 26, 2008 procedure; and 8) awarding past medical expenses in the amount of $49,664, which reflected expenses for both the June 17, 2008 and December 26, 2008 procedures. In her Answer to the appeal, Ms. Fanguy seeks modification of the trial court’s general damage award, arguing the trial court’s $33,000 general damage award is abusively low and does not adequately compensate her for her pain and suffering. Additionally, Ms. Fanguy contends that the trial court erred in failing to award her damages for loss of enjoyment of life.
LAW AND ANALYSIS[8]
Breach of Standard of Care
Defendants allege the trial court erred in finding that Dr. Graham breached any standard of care in regard to his treatment of Ms. Fanguy. Defendants argue that, while Ms. Fanguy’s primary argument involved the allegation that Dr. Graham breached the standard of care for informed consent by failing to offer her *490 Lupron as an alternative treatment prior to her surgeries in June and December of |fl2008, the trial court only found Dr. Graham breached the standard of care of informed consent for the removal of Ms. Fanguy’s right ovary. Defendants insist that, since Ms. Fanguy’s endometriosis was not a confirmed diagnosis prior to the June 2008 procedure and Lupron was not the recommended treatment for adeno-myosis, Lupron was not a reasonable alternative therapy for Ms. Fanguy prior to the surgeries performed by Dr. Graham and she would have still needed a hysterectomy.
Defendants further argue that the consent form signed by Ms. Fanguy on December 17, 2008 clearly states the procedure would place a lighted scope into her abdomen, remove her uterus, and possibly remove an ovary and tubes. From that language, Defendants contend that Dr. Graham had the permission and consent to evaluate Ms. Fanguy’s condition during the surgery and possibly remove her ovaries and tubes; and in his medical opinion at the time of the surgery, Dr. Graham decided to remove the right ovary in her best interest. Defendants further contend that, in accordance with the wishes of Ms. Fanguy, Dr. Graham left the healthier of her ovaries for hormone stabilization and prevention of early menopause. Because the signed consent form in this matter is presumed to be valid and the clear language of the consent form states that either ovary could have possibly been removed, Defendants assert there is no legal or evidentiary basis for the trial court’s finding that Dr. Graham did not obtain informed consent to remove Ms. Fanguy’s right ovary. Additionally, Defendants assert that Ms. Fanguy medically benefitted from the hysterectomy by treatment of the adenomyosis and the remaining complaints of pain from residual endometriosis. As a result, Defendants contend they are entitled to reversal of the trial court’s judgment.
Conversely, Ms. Fanguy avers that, when faced with the discretion of weighing Dr. Graham’s testimony against all of the other evidence presented, the trial court’s finding that Dr. Graham breached his standard of care is reasonable |7and is supported by the record. Ms. Fanguy maintains that the record shows Dr. Graham failed to inform her of any medical alternatives endorsed by the American College of Obstetricians and Gynecologists, specifically the Lupron therapy, prior to the June 2008 procedure or December 2008 procedure, and that the failure to inform her of alternatives proved that Dr. Graham breached the standard of care regarding informed consent as required by medical ethics and Louisiana’s Uniform Consent Act. She further maintains that, since neither of the consent forms for the procedures mention any reasonable therapeutic alternatives to the procedures, her signatures on the consent forms do not exonerate Dr. Graham from breach of his standard of care because she was deprived of her right to make an informed decision regarding her own medical treatment. Ms. Fanguy also avers that the trial court had the discretion to give less weight to Dr. Graham’s self-sei-ving testimony that he removed the right ovary in her best interest when there was evidence presented by a pathologist that the right ovary showed no disease, adhesions or scar tissue upon gross or microscopic evaluation of it. Thus, Ms. Fanguy contends there is no basis to reverse the trial court’s findings on this issue.
The Louisiana Supreme Court, in Snider v. La. Med. Mut. Ins. Co., 14-1964 (La. 5/5/15); 169 So.3d 319, 323, rehearing denied, 14-1964 (La. 6/30/15); 2015 La. LEXIS 1501, set forth the following guide *491 lines for reviewing factual determinations of the trial court:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. This test dictates that a reviewing court must do more than simply review the record for some evidence that may controvert the trial court ruling. Rather, it requires a review of the entire record to determine whether manifest error has occurred. Thus, the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. The appellate court must not reweigh the evidence or substitute its own | ^factual findings because it would have decided the case differently. Where the factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony.
(Internal citations omitted).
In this matter, Ms. Fanguy, among other allegations, alleged that Dr. Graham’s treatment of her left-sided pelvic pain fell below the standard of care because he failed to obtain informed consent for both the June 2008 and December 2008 procedures. She specifically alleged that Dr. Graham failed to adequately set forth the nature and purpose of the procedures, and he failed to disclose reasonable therapeutic alternatives to the procedures. In its judgment, the trial court found that Dr. Graham’s treatment of Ms. Fanguy fell below the standard of care in failing to obtain informed consent to remove Ms. Fanguy’s right ovary and in the removal of the right ovary. Thus, we must inquire into whether the trial court’s findings of lack of informed consent were manifestly erroneous or clearly wrong.
A plaintiff in a medical malpractice action is required to establish: 1) the standard of care applicable to the doctor; 2) a violation by the doctor of that standard of care; and 3) a causal connection between the doctor’s alleged negligence and the plaintiffs injuries. Suarez v. Mando, 10-853 (La. App. 5 Cir. 3/29/11); 62 So.3d 131, 134, writ denied, 11-885 (La. 6/17/11); 63 So.3d 1036, citing La. R.S. 9:2794(A); Pfiffner v. Correa, 94-924 (La. 10/17/94); 643 So.2d 1228, 1233. Expert testimony is generally required to establish the applicable standard of care and whether that standard was breached, except where the negligence is so obvious that a layperson can infer negligence without the guidance of expert testimony, such as fracturing a leg during examination, amputating the wrong limb, dropping a knife or scalpel on a patient, or leaving a sponge in a patient’s body. Id.
[¡/The law of informed consent in Louisiana is both jurisprudential and statutory. Martin v. Berthier, 09-1360 (La. App. 4 Cir. 5/20/10); 39 So.3d 774, 778. The requirement of consent to medical treatment was initially based on the idea that a competent person has the right to make decisions regarding his or her own body, and that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Lugenbuhl v. Dowling, 96-1575 (La. 10/10/97); 701 So.2d 447, 450; Boudoin v. *492 Crawford & Marshall, Ltd., 97-224 (La. App. 5 Cir. 1/14/98); 709 So.2d 798, 803.
Under the Louisiana Informed Consent Law,[9] a physician is required to provide his patient -with sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to the proposed course of treatment. Suarez, 62 So.3d at 135. This information should include, if possible, “the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.” Id., citing Hondroulis v. Schuhmacher, 553 So.2d 398, 410 (La. 1988)(on rehearing). A physician must also inform the patient of any alternatives that exist to a surgical procedure. In re Pertuit, 10-654 (La. App. 4 Cir. 9/22/10); 49 So.3d 932, 936. When written consent to medical treatment is voluntarily given by the patient, such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts. La. R.S. 40:1299.39.5(A).
When a breach of the standard of care of informed consent is alleged, the plaintiff bears the burden of proving: 1) the existence of a material risk which the 1 mphysician must disclose; 2) the failure of the physician to inform the patient of a material risk; 3) the realization of the material risk; and 4) a causal connection between the failure to inform the patient of the risk and the realization of the risk. Suarez, supra, citing Labit v. Cobb, 10-463 (La.App. 3 Cir. 11/3/10); 50 So.3d 267, 271. A risk is material “when a reasonable person in what the doctor knows or should know to be the patient’s position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.” Id., citing Hondroulis, 553 So.2d at 412. When consent to treatment is given by the patient, but the patient does not have sufficient information to make an informed decision concerning his or her treatment, the doctor may be liable in negligence for bad results obtained. LaCaze v. Collier, 434 So.2d 1039, 1040, n. 1 (La. 6/17/83).
Here, Defendants assert that Ms. Fan-guy signed consent forms for both of the procedures. Ms. Fanguy’s consent forms are presumed to be valid. See, La. R.S. 40:1299.39.5(A). However, proof that the execution of Ms. Fanguy’s consent was induced by the misrepresentation of material facts by Dr. Graham was presented at trial.
During the presentation of her case, Ms. Fanguy introduced the deposition testimonies of Dr. James Tappan into evidence. In his depositions, Dr. Tappan testified that, in his opinion, Dr. Graham breached the standard of care by failing to obtain Ms. Fanguy’s informed consent for both the June 2008 and December 2008 procedures. Dr. Tappan stated that Ms. Fanguy’s medical record indicated that she was not informed by Dr. Graham of reasonable therapeutic alternatives, e.g., non-sterodial, anti-inflammatory medications, low dose oral contraceptives, or gonadotropin-re-leasing hormone medications (GnRH) for her complaints of chronic pelvic pain in June 2008. He also stated that the GnRH Lupron treatment was one of the most popular options on the market for the *493 treatment of | n endometriosis and was recommended by the American College of Obstetrics and Gynecology for treatment prior to a surgical diagnosis for chronic pelvic pain. Dr. Tappan opined that the June 2008 procedure performed by Dr. Graham had no medical benefit for the treatment of Ms. Fanguy’s endometriosis because: 1) Dr. Graham performed a second laparoscopy rather than attempting to eradicate endometrial implants and assessing the nature of the disease; 2) Dr. Graham used a laser drilling/brushing technique that did not help the disease; and 3) Ms. Fanguy still complained of pain after the procedure. Dr. Tappan stated that the textbooks in operative gynecology do not recommend the laser drilling/brushing technique used during the June 2008 procedure because it causes additional scarring. Dr. Tappan testified that, despite Dr. Graham’s recommendation, observation was not the only therapeutic alternative available to the procedure to Ms. Fan-guy.[10]
In reference to the December 2008 surgery, when questioned about a surgical remedy to endometriosis, Dr. Tappan testified that surgical menopause, which requires the removal of both ovaries, was a cure for Ms. Fanguy’s endometriosis. He explained that removal of both ovaries, instead of one ovary, was required for Ms. Fanguy’s treatment because “if one removes only one ovary, there remains, therefore, the source of estrogen that stimulates the endometriosis, and therefore, just taking out one ovary does not cure the disease.” Dr. Tappan also testified that Lupron is used in the treatment of adeno-myosis. Because Dr. Graham did not discuss reasonable therapeutic alternatives to surgery and, subsequently, only removed one of Ms. Fanguy’s ovaries, Dr. Tappan opined that Dr. Graham breached his standard of care with the December 2008 surgery. Dr. Tappan testified that due to Dr. Graham’s breach of his standard of care, Ms. |1gFanguy still experienced pain after the hysterectomy and had to seek treatment with another physician.[11]
Ms. Fanguy testified that during her June 6, 2008 appointment with Dr. Graham, he did not mention that he suspected she had endometriosis or recommend Lu-pron in lieu of the surgical procedure but indicated her only option was a laparosco-py. While she experienced temporary pain relief, Ms. Fanguy stated that her pelvic pain intensified in severity about two months after the June 17, 2008 procedure. She testified that upon returning to Dr. Graham with her pelvic pain complaints, Dr. Graham informed her that she could have her uterus and an ovary removed to alleviate her pain. Ms. Fanguy testified that, prior to December 2008, although she was diagnosed with pelvic pain, dyspareu-nia and menorrhagia, Dr. Graham had not informed her of the endometriosis diagnosis or possible adenomyosis diagnosis. She stated that Dr. Graham’s only alternative to the surgery for her pelvic pain was observation, and that he did not discuss any medical alternatives with her.
Ms. Fanguy further testified that she consented to a partial hysterectomy, the removal of her uterus and left ovary, upon the advice of Dr. Graham, because she thought it would stop the pelvic pain. She stated that she was shocked to discover post-surgery that her right ovary, instead of her left ovary, had been removed be *494 cause she had been experiencing consistent strong pressure and a stabbing pain on her left side. Ms. Fanguy asserted that the December 2008 surgery did not help, and her pelvic pain began to intensify in severity again. She said that she had no knowledge that leaving an ovary would continue her endometriosis symptoms because Dr. Graham did not explain the effects of the surgery to her. After seeking a second opinion from Dr. Susan Jeanfreau, Ms. Fanguy was prescribed a Lupron | ^treatment and experienced significant improvement with her pelvic pain after the treatment.
In the presentation of their defense, Defendants presented Dr. Graham to testify in regards to his standard of care. Dr. Graham testified that he did not prescribe Lupron to Ms. Fanguy prior to the June 2008 procedure because he had not yet diagnosed her with endometriosis, and that he would not have prescribed Lupron to Ms. Fanguy without a confirmed diagnosis of endometriosis. After the procedure, Dr. Graham stated he did not prescribe Lu-pron to Ms. Fanguy because he did not think it would have solved her pelvic pain problem. He also stated that he discussed Lupron with Ms. Fanguy prior to the December 2008 surgery, but he did not mention the discussion in his chart. Although acknowledging that pelvic pain, dyspareu-nia, and menorrhagia could have been problems associated with endometriosis, Dr. Graham testified that he offered Ms. Fanguy a partial hysterectomy to solve those problems. On cross-examination, Dr. Graham admitted that he listed “pelvic pain status post previous laparoscopy with endometriosis” as a preoperative diagnosis for Ms. Fanguy on the “Doctors Same Day Surgery Center Operative Report” for the June 2008 procedure.
Defendants also presented the testimony of Dr. William von Almen, an OB/GYN. He opined that his review of Ms. Fanguy’s medical record showed that Dr. Graham did not breach his standard of care by not offering Ms. Fanguy Lupron prior to the June 2008 procedure. Dr. von Almen stated that the only true way to make a diagnosis of endometriosis is to either visually see it or have a pathological verification of it. He testified that Lupron therapy is recommended prior to surgery; however, he prefers to have a definitive diagnosis prior to prescribing Lupron because it makes the patient pseudo-menopausal. He also opined that Dr. Graham did not breach his standard of care for the December 2008 surgery. Dr. |14von Almen testified that Lupron therapy is not a treatment for adenomyosis, and that the only cure to adenomyosis is with a hysterectomy.
Dr. Jack Jacob also testified that Dr. Graham did not breach his standard of care in the treatment of Ms. Fanguy for either the June 2008 or the December 2008 procedures. He stated that he would not have prescribed Lupron if he did not feel it was appropriate or did not have confirmation of endometriosis. He testified some unseen or untreated endometriosis may have been the cause of Ms. Fanguy’s pelvic pain prior to the December 2008 surgery. Even though the removal of both ovaries had been recommended in the past, Dr. Jacob testified that leaving one ovary in a younger person is a medical option respected today, despite the possibility that the remaining ovary may continue to stimulate endometriosis. However, he stated that the definitive treatment for adeno-myosis is a hysterectomy.
Considering the evidence presented to the trial court, we cannot find the trial court was manifestly erroneous in its finding that Dr. Graham breached his standard of care in failing to obtain informed consent from Ms. Fanguy. Although there *495 was medical testimony presented that supported both sides of the issues, the record supports the trial court’s determination through the testimonies of Dr. Tappan and Ms. Fanguy. Dr. Tappan’s testimony that there was a possibility Ms. Fanguy would continue to experience pelvic pain due to the fact that the remaining ovary would still produce estrogen, which meant that endometriosis could still be stimulated, and Ms. Fanguy’s testimony that she was not informed by Dr. Graham that there was a possibility she would continue to experience pelvic pain after the partial hysterectomy support the finding that Dr. Graham breached his standard of care in fading to obtain informed consent to remove her right ovary and the actual removal of the right ovary. When the factfinder’s determination is based on its decision to credit the testimony of one expert over another, that finding can virtually never be manifestly erroneous. See, Snider, supra. The trial court | ^clearly found Ms. Fanguy’s evidence to be more persuasive that Dr. Graham failed to provide her with sufficient information to make an informed and intelligent decision to consent to the June and December 2008 procedures. Therefore, we decline to disturb the trial court’s reasonable finding in this matter.
Award of $49,664 for Past Medical Expenses
Defendants allege the trial court erred in awarding Ms. Fanguy $49,664 for past medical expenses pursuant to the court’s finding that Dr. Graham failed to obtain informed consent to remove her right ovary. Defendants assert that the amount awarded by the trial court reflects the combined amounts from the June 2008 and December 2008 procedures, but Ms. Fanguy’s right ovary was removed during the December 2008 surgery. Defendants argue the trial court did not find that either of the two surgeries were unnecessary or unwarranted. Because the December 2008 surgery was proven to be medically necessary in relation to the hysterectomy, Defendants specifically claim that Ms. Fanguy should not be entitled to any past medical expenses for that particular surgery, and the award of past medical expenses should be reduced to exclude the costs of the December 2008 procedure. Defendants further argue that the $49,664 awarded for past medical expenses is not supported by and is contrary to the trial court’s sole finding of fact that Dr. Graham failed to obtain informed consent to remove Ms. Fanguy’s right ovary during the December 2008 surgery.
Ms. Fanguy argues that both the June 2008 and December 2008 procedures were unnecessary, and that she was entitled to an award for the expenses incurred from both of the procedures. She contends that evidence of the extreme, exquisite pain that existed over the entire period of time in which she was under Dr. Graham’s care could have been relieved by the non-surgical Lupron therapy.
 Our standard review of an award of damages was set forth by the Louisiana Supreme Court in Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La. 1993), as follows:
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion. And, “it is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient.” Appellate courts review the evidence in the light which most favorably supports the judgement to determine whether the tri *496 er of fact was clearly wrong in its conclusions. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the [trial court] abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff.
(Internal citations omitted).
Here, even though the trial court specifically found that Dr. Graham’s treatment of Ms. Fanguy fell below the standard of care in failing to obtain informed consent to remove her right ovary and in removing the right ovary, the trial court inherently found that the June 2008 and December 2008 procedures were medically unnecessary by the fact that it awarded Ms. Fan-guy $49,664 for past medical expenses, which encompassed the expenses for both procedures. Although the judgment did not specifically state a finding of fact that Dr. Graham failed to obtain expressed informed consent for both procedures in this matter, we find no contradiction in the judgment or that the trial court rejected the claims that both procedures were medically unnecessary. The award of past medical expenses clearly shows that the trial court accepted Ms. Fanguy’s claims that Dr. Graham failed to obtain informed consent for both procedures.[12] After review, we find that |17the trial court’s determination that Ms. Fanguy was entitled to past medical expenses for both the June 2008 and December 2008 procedures is fully supported by evidence in the record.
In his deposition testimonies, Dr. Tap-pan opined that Dr. Graham breached his standard of care in the treatment of Ms. Fanguy for the June 2008 and December 2008 procedures because Dr. Graham did not discuss reasonable therapeutic alternatives to either surgery with Ms. Fanguy, and Dr. Graham only removed one ovary in the December 2008 surgery, as opposed to the removal of both ovaries to stop the stimulation of the endometriosis. Dr. Tap-pan also testified that, in addition to treating endometriosis, Lupron is used in the treatment of adenomyosis by improving the symptoms associated with adenomyo-sis, e.g,, menstrual cramping and pain and heavy menstrual flow. When questioned about the origin of Ms. Fanguy’s pelvic pain, Dr. Tappan noted that the fact that the set of symptoms she complained of responded to Lupron following the removal of her uterus and right ovary was highly suggestive that endometriosis had been her problem all along, which could have been successfully treated with Lupron. Furthermore, Dr. Graham’s own testimony that Ms. Fanguy’s pelvic pain, dyspareu-nia, and menorrhagia could have been problems associated with endometriosis gives credence to Dr. Tappan’s opinion.
From the evidence presented for this matter, it was reasonable for the trial court to award Ms. Fanguy the expenses for the June 2008 and December 2008 procedures. There was evidence presented that supported the conclusion that both procedures were medically unnecessary. However, we find that the trial court erred in awarding Ms. Fanguy $49,664 in past medical expenses, as the evidence present *497 ed does not support that amount.[13] From our review, Ms. Fanguy is entitled to a total amount of $48,607.69, which includes the medical expenses claimed for June 17, 2008 and December 26, 2008 and her co-pays. Therefore,'we amend Ms. Fanguy’s award for past medical expenses to reflect an award of $48,607.69.
Answer to Appeal
In her Answer to this appeal, Ms. Fanguy requests that this Court modify the trial court’s judgment and increase the amount of general damages awarded to her. Ms. Fanguy contends the award of $33,000 for past, present, and future pain and suffering was inadequate to fully compensate her for her damages, and the trial court erred in not rendering an award for loss of enjoyment of life. She argues that evidence of extreme, exquisite pain that persisted over the entire period of time she was under the care of Dr. Graham was presented to the trial court, and that pain could have been relieved by non-surgical, Lupron therapy.
Defendants argue that, if this Court does not reverse the judgment of the trial court, that the general damage award is more than sufficient to compensate Ms. Fanguy for the ruling concerning informed consent for the removal of the right ovary. Defendants maintain there was no testimony of any detrimental change in Ms. Fan-guy’s lifestyle to support an award for loss of enjoyment as a separate aspect of the damages.
General damages are those which may not be fixed with pecuniary exactitude. Wiltz v. Bros. Petroleum, L.L.C., 13-332 (La.App. 5 Cir. 4/23/14); 140 So.3d 758, 785, rehearing granted on other grounds, 13-332 (La. App. 5 Cir. 5/21/14). Instead, they “involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.” Id., citing Buckheister v. U.S. Environmental Services, LLC, 11-1148 (La.App. 5 Cir. 5/31/12); 97 So.3d 414, 422. Vast discretion is accorded to the trier of fact in fixing general damage awards, and that vast discretion is such that an appellate court should rarely disturb an award of general damages. Id. at 785-86. Before an appellate court can disturb an award made by the factfinder, the record must clearly reveal that the trier of fact abused its discretion in making the award. Lockett v. UV Ins. Risk Retention Grp., Inc., 15-166 (La. App. 5 Cir. 11/19/15); 180 So.3d 557, 556. Only after finding that the lower court abused its discretion is a resort to prior awards by the appellate court appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within the discretion afforded that court. Id. at 556-57.
In this matter, Ms. Fanguy had been a patient of Dr. Graham over the span of many years.[14] As early as 1996, she complained to Dr. Graham of left-sided pelvic pain. On June 3, 2008, Ms. Fanguy went to the emergency room at Tulane Hospital *498 complaining of abdominal pain in her lower left quadrant. In her follow-up appointment with Dr. Graham, Ms. Fangu/s examination was normal except for left-ad-nexal tenderness and an enlarged uterus. On June 17, 2008, Dr. Graham performed a laparoscopic procedure on Ms. Fanguy that used a laser drilling/brushing technique to treat a “false pocket” consistent with endometriosis on the right uteroscral ligament. A few months later, Ms. Fanguy returned to Dr. Graham complaining again of worsening left-sided pelvic pain that she described as a “constant ache,” heavy bleeding and increasing dyspareunia that was not relieved by the June 2008 procedure. Subsequently, Dr. Graham performed a hysterectomy on Ms. Fanguy, on December 27, 2008, that removed major reproductive organs, her uterus and right ovary. Ms. Fanguy was 35 years old at the time of the December procedure. Lupron therapy was not discussed with Ms. Fan-guy as a non-surgical alternative prior to the December procedure, as | ¡^“observation” was the only alternative treatment recommended by Dr. Graham. As mentioned earlier, the evidence presented at trial supported the conclusion that both the June and December 2008 procedures were medically unnecessary.
Ms. Fanguy testified that she suffered with debilitating pelvic pain for years while under Dr. Graham’s care. After both the June 2008 and December 2008 procedures, she experienced returning and worsening left-sided pain, even though Dr. Graham told her that the pain would stop if she had her uterus and one ovary removed. She also testified that she began experiencing right-sided pain after the removal of her right ovary, where she previously had no pain in that area. Ms. Fanguy stated that, prior to her Lupron treatment under Dr. Jeanfreau, she suffered a varied intensity of pain nearly every single day. She described the pain as being excruciating by the time she went to her first visit with Dr. Jeanfreau. Ms. Fanguy said that she could not stand for long periods of time and was confined to the bed several days of the month from the pelvic pain she was experiencing. After receiving half of the injections for the Lupron therapy, Ms. Fanguy testified that her condition improved and she did not continue the second half of the Lupron therapy injections because she felt they were unnecessary.
Considering the significant and permanent consequences of the procedures sustained by Ms. Fanguy and the total general damages award, we conclude that the general damage award, totaling $33,000, is abusively low. We find that no rational trier of fact could assess the effects of Ms. Fanguy’s damages at $33,000, especially when considering the facts that she lost major reproductive organs and experienced debilitating pain. According, we turn to a similar case to determine an appropriate award.
In Oakley v. Stelly, 02-1002 (La.App. 3 Cir. 2/5/03); 838 So.2d 911, the Louisiana Third Circuit affirmed a trial court judgment that awarded $75,000 for loss of pro-creativity to a female patient who had her ovaries removed without her |⅞1 consent during a hysterectomy, where the patient only consented to have her uterus removed during the procedure.
After review, we find that an award of $50,000 is a reasonable award for Ms. Fan-guy’s pain and suffering for the unnecessary removal of her reproductive organs without her informed consent.
Furthermore, we agree that Ms. Fanguy is entitled to an award for loss of enjoyment of life. Loss of enjoyment of life refers to the detrimental altei-ations to a person’s life or lifestyle or a person’s inability to participate in the activities or pleasures of life that were formerly en *499 joyed prior to the injury. Willis v. Noble Drilling (United States), Inc., 11-598 (La. App. 5 Cir. 11/13/12); 105 So.3d 828, 845. Whether a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury. Id. A separate award for loss of enjoyment of life is warranted and is not duplicative of the award of pain and suffering, if the damages resulting from loss of enjoyment of life are sufficiently proven. McGee v. AC and S, Inc., 05-1036 (La. 7/10/06); 933 So.2d 770, 775.
In addition to the debilitating pelvic pain she experienced, Ms. Fanguy testified that she could not be active with her children because she was confined to her bed with pain. She was not able to sit in a chair long enough to teach her children,[15] or go outside because of the pressure she felt in her abdomen. She also stated that the restrained activity forced by her pelvic pain led to an emotional disconnection with her children, which improved after her Lupron treatment. Ms. Fanguy also testified that, since she started the Lupron therapy, she was able to attend nursing school, a feat that would not have been feasible in 2008 due to her inability to keep up with certain physical demands. Considering this evidence, we find that Ms. Fanguy sufficiently proved her damages resulting from a loss of) ¡^enjoyment of life due to her pelvic pain. Therefore, we find the trial court was manifestly erroneous in failing to award Ms. Fanguy an award for loss of enjoyment of life, and we render an award for $15,000 for loss of enjoyment of life.
Accordingly, we reverse the trial court’s judgment in part and amend it to reflect an award for pain and suffering in the amount of $50,000 and render an award for loss of enjoyment of life in the amount of $15,000, in addition to the $48,607.69 amended award for past medical expenses.
DECREE
For the foregoing reasons, we affirm the trial court’s finding that Dr. Graham breached the standard of care in failing to obtain Ms. Fangu/s informed consent pri- or to performing surgery and in awarding Ms. Fanguy past medical expenses for both the June 2008 and December 2008 procedures. We amend the amount trial court’s award for past medical expenses to $48,607.69 to conform to the evidence presented. Further, we amend the trial court’s award of $33,000 for general damages, finding it abusively low, and award Ms. Fanguy $50,000 for pain and suffering. Finally, we reverse the trial court’s denial of compensation for loss of enjoyment of life and render Ms. Fanguy an award of $15,000 in that regard. Lexington Insurance Company and Dr. Michael Graham are assessed the costs of this appeal.
REVERSED IN PART; AFFIRMED AS AMENDED

. Uncontradicted testimony and evidence shows that Ms. Fanguy first started going to Dr. Graham in 1990 for her first pregnancy. In 1996, Ms. Fanguy first reported left-sided pelvic pain. Ms. Fanguy testified that the major gaps in treatment from 1996 to June 2008 were due to a lapse of insurance during those times.

. Dr. Graham testified that endometriosis is "when the gland inside the uterus, which is the lining, which sheds every month, is when those cells grow in what we call ectopic places, or in places that they don't belong.”

. Dr. Graham testified that adenomyosis is “when the glands actually—they invade the muscle of the uterus. And significant with that usually is pain, with the cycle, as well as sometimes dyspareunia, painful relations; and a lot of times we see a lot heavier bleeding when patients have adenomyosis.”

. Dr. Graham testified that “[pjelvic pain is one of those problems for us as gynecologists, and they can come from a multitude of areas, It can be pelvic infections, chlamydia, gonorrhea; it can be from prolapsed organs, because of reproductive capacity; it can be from endometriosis; it can be from any kind of infection, other infections in the abdomen, after surgery; it can be from caesarian sections, because of scar tissue build-up after surgery.”

. Dr. Graham testified that dyspareunia is “painful intercourse,”

. Dr. Graham testified that menorrhagia is “heavy bleeding.”

. The panel made additional findings regarding Ms. Fanguy’s complaints against Dr. Graham; however, those findings are inapplicable to this appeal.

. For ease of analysis, assignments of error numbers one and two will be addressed jointly-

. At the time of the June 2008 and December 2008 procedures, La. R.S. 40:1299.40 was the law in effect governing the informed consent law. However, La. R.S. 40:1299.40 was repealed by Acts 2012, No. 759, § 3, which took effect on June 12, 2012. The law governing informed consent is now contained in La. R.S. 40:1299.39.5.

. On the consent form dated June 16, 2008, for the June 2008 procedure, "observation” is listed as the only therapeutic alternative to the procedure by Dr. Graham.

. Dr. Susan Jeanfreau, subsequently, prescribed Ms. Fanguy Lupron to successfully treat her continued chronic pelvic pain.

. Although the limited reasons for judgment only state a finding of fact as to the December 2008 surgery, the dispositive portion of the judgment compensated Ms. Fanguy for both surgeries, which included past medical expenses in the amount of $22,149,73 for the June 2008 surgery and $27,514.27 for the December 2008 surgery. Because the trial court awarded past medical expenses for both surgeries, using the dollar amount reflected in the joint pre-trial statement as the total amount for both surgeries, we note that it is not presumed that Ms. Fanguy’s claims for the June 2008 surgery were rejected.

. At trial, Ms. Fanguy did not itemize her medical expenses. While we consider the "Claim Summary Report” submitted by Ms. Fanguy in support of her medical expenses, we only use the claims submitted for June 17, 2008 and December 26, 2008 in the calculation of Ms. Fanguy’s award for past medical expenses. Although there are numerous other expenses listed in the summary, Ms. Fanguy did not present the evidence that directly relates those expenses to the procedures in question,

. Ms. Fanguy testified that she did not see Dr. Graham for a couple of years due to lack of health insurance.

. Ms. Fanguy homeschooled all three of her children.